UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 12/29/2022           │
└─────────────────────────────────┘
```

---

ABSOLUTE RESOLUTIONS INVESTMENTS,
LLC,

                    Plaintiff,

         - against -

CITIBANK, N.A.,

                    Defendant.

---

22 Civ. 2079 (VM)

**DECISION AND
ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Absolute Resolutions Investments, LLC ("Absolute") brings this action against defendant Citibank, N.A. ("Citibank"). This action was originally filed in the Supreme Court of the State of New York, New York County. Citibank removed the action to this Court on the basis of diversity jurisdiction. (See Dkt. No. 1.) The removed complaint alleges that Citibank engaged in fraud, negligent misrepresentation, breach of contract, and breach of the covenant of good faith and fair dealing in connection with Citibank's sale of delinquent consumer credit card accounts to Absolute. (See "Complaint," Dkt. No. 1-1.)

Now pending before the Court is Citibank's motion to dismiss Absolute's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (See "Motion,"

Dkt. No. 13.) For the reasons set forth below, the Motion is **GRANTED** in its entirety, and Absolute's claims are dismissed without prejudice to Absolute's filing an amended complaint within 21 days of the date of this Order.

## I.   BACKGROUND

A.   FACTS[1]

1.   Citibank's Sale of Delinquent Credit Card Accounts

Citibank provides branded and retail credit card products and services. As part of those products and services, Citibank sells delinquent credit card accounts to pre-approved third-party debt collectors or assigns such accounts to collection agencies. The sale of certain delinquent accounts is conducted either in bulk or in a multi-month flow of accounts (a "flow sale"). In a flow sale, accounts are sold over a series of months when they are deemed unlikely to be paid and are "charged off." This process relieves Citibank of the need to conduct multiple sales.

Before sale, delinquent accounts are grouped according to common characteristics, such as the age of the debt. After those accounts are grouped, prospective buyers are given the

---

[1] Except as otherwise noted, the following background derives from the Complaint. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to plaintiff, as required under the standard set forth in Section II below.

opportunity to conduct due diligence on the accounts. Citibank provides prospective buyers with a sample portfolio of information about accounts to be included in the first month of the multi-month flow. For example, a sample portfolio may detail the amount owed by the debtor, the date the account was determined to be delinquent, the last payment date, the state of residence of the account holder, whether the account is eligible for assistance from a debt settlement company, and other such information.

Most consumer-specific information is redacted from the sample portfolio. Prospective buyers may, however, use the services of a third-party data transferor, identified and approved by Citibank, to analyze the redacted information. In addition to the sample portfolio, Citibank typically provides prospective buyers with a "seller survey" that contains additional portfolio-specific information about the accounts to be sold.

Certain accounts are regarded as having a higher value than other accounts. In addition to accounts with a higher balance, accounts originating from creditor-advantageous collection states and accounts qualifying for debt settlement company assistance are also considered to have a higher value. Similarly, newly charged-off accounts that have not been

subject to prior collection efforts are also considered to have a higher value.

Following the diligence period, Citibank opens bidding to prospective buyers. Prospective buyers use the information obtained during the diligence period to determine whether to bid, assess their potential return on investment, and calculate how much to bid.

> 2.   Absolute Contracts with Citibank to Purchase Delinquent Accounts

On July 25, 2019, Absolute and Citibank entered into a Master Purchase and Sale Agreement (the "2019 Master Agreement"),[2] that contained the terms and conditions under which Citibank would make flow sales of delinquent accounts to Absolute. (See Dkt. No. 15-1.) For example, the 2019 Master Agreement specified the representations and warranties of Citibank and Absolute, as well as their rights and obligations after the close of a sale. Citibank represented that the "information provided by [Citibank] on the due diligence file is substantially similar to the final electronic file provided to [Absolute] in connection with the closing[.]" (See id.) In the event of an agreed upon sale of accounts, the 2019 Master Agreement contemplated the execution of an

---

[2] The 2019 Master Agreement is incorporated by reference in the Complaint.

addendum for each such sale, which would specify additional terms and finalize the sale. (See id.)

In October 2019, Absolute bid on a four-month flow of accounts and received a sample portfolio as well as a seller survey (the "2019 Seller Survey")[3] regarding the accounts. (See Dkt. No. 19-1 (titled "SELLER SURVEY – Citi Brands and Costco Credit Cards Early Out 120 Day Flow").) The 2019 Seller Survey contained additional information regarding the proposed sale, including the estimated dollar amount and number of accounts. (See id.) The 2019 Seller Survey noted that "up to 10% of the sale eligible accounts will likely be retained by Citi[bank] from each month's delivery but reserve the right to withhold up to 20%. These accounts are randomly selected from the sale eligible pool." (See id.) The 2019 Seller Survey also noted at the bottom of each page that it "provides context to the sale identified within this survey" and "advises that variances may occur with respect to the actual product delivered." (See id.)

Following the bidding process, Citibank informed Absolute that it had won the bid for the four-month flow starting in October 2019. In accordance with the 2019 Master Agreement, Citibank issued an addendum (the "October 2019

---

[3] The 2019 Seller Survey is incorporated by reference in the Complaint.

Addendum")[4] to be executed by the parties. (See Dkt. No. 21-1 (titled "Addendum No. 4 October 2019 Brands and Costco Early Out 120 Day Flow Accounts").) The October 2019 Addendum contained a "Special Provision" explaining that "[e]ach data file delivered by Bank to Buyer during the Term of this Agreement shall be substantially similar to the data file on which Buyer based its bid in all material scoring characteristics." (See id.) The October 2019 Addendum also stated that the "Addendum and Master Agreement set forth the entire understanding of the Parties with respect to the subject matter hereof and supersedes to the extent indicated all prior agreements, letters, covenants, arrangements, communications, representations, whether oral or written by any representative of either party." (See id.)

On October 24, 2019, Absolute and Citibank executed the October 2019 Addendum, under which Absolute would receive four consecutive monthly batches of delinquent accounts, from October 2019 to January 2020 (the "October 2019 Sale"). The accounts received by Absolute in the October 2019 Sale, however, contained a lower percentage of higher-value accounts and a higher percentage of lower-value accounts than

---

[4] The October 2019 Addendum is incorporated by reference in the Complaint.

what had been previewed in due diligence.[5] Absolute alleges that it had used the information derived from its due diligence to calculate its bid, Absolute received less-valuable accounts than it had bargained for. According to Absolute, the difference between the accounts it previewed and those it received did not correspond with purely random removal.[6]

3. Absolute and Citibank Execute a Second Master Purchase and Sale Agreement and Contract for Additional Account Sales

On March 9, 2020, Absolute and Citibank executed another Master Purchase and Sale Agreement (the "2020 Master Agreement" and together with the 2019 Master Agreement, the "Master Agreements"),[7] which was similar to the one executed in 2019. (See Dkt. No. 15-2.) Absolute then bid on a three-month flow of accounts, with the initial batch to be transferred in March 2020. Absolute again received a due diligence package, including a seller survey (the "March 2020

---

[5] Specifically, of the 4,468 accounts Absolute previewed in the October 2019 Sale, Absolute considered 2,367 (or 53%) to be higher-value accounts. Absolute received 3,819 accounts with only 1,953 (or 51%) of higher-value accounts. Of the 649 accounts that were not transferred to Absolute, 414 (or 64%) were higher-value accounts.

[6] According to Absolute's statistical analysis, if the account removal was random, then 53% of the removed accounts would have been higher-value accounts, instead 64% of the removed accounts that were higher-value accounts.

[7] The 2020 Master Agreement is incorporated by reference in the Complaint.

Seller Survey").[8] (See Dkt. No. 19-1 (titled "SELLER SURVEY – Citi Brands and Costco Credit Cards Early Out 90 Day Flow Lot B").) Like the 2019 Seller Survey, the March 2020 Seller Survey specified that "up to 15% of sale eligible accounts will likely be retained by Citi[bank] from each month's delivery but [Citibank] reserve[s] the right to withhold up to 20%. These accounts are randomly selected from the sale eligible pool." (See id.) Additionally, as with the 2019 Seller Survey, the March 2020 Seller Survey included a note that "variances may occur with respect to actual product delivered." (See id.)

Absolute proceeded to win the bid, and the parties executed an addendum on March 25, 2020 (the "March 2020 Addendum")[9] to finalize the sale (the "March 2020 Sale"). (See Dkt. No. 21-2 (titled "Addendum No. 2 Brands and Costco Early Out 90 Day Flow Lot B Accounts").) The March 2020 Addendum lacked the Special Provision language present in the October 2019 Addendum but again included the disclaimer that the Addendum along with the Master Agreement "set forth the entire understanding of the Parties." (See id.)

---

[8] The March 2020 Seller Survey is incorporated by reference in the Complaint.
[9] The March 2020 Addendum is incorporated by reference in the Complaint.

As expected, Citibank transferred the first batch of accounts in March 2020. In April, however, Citibank informed Absolute that it was suspending flow sales because of the COVID-19 pandemic, and no transfer took place that month. Though sales were resumed in May, Citibank insisted that Absolute execute a release (the "Release") before any transfer of accounts took place. Citibank also implied that if Absolute did not agree to the Release, then Absolute would be removed from Citibank's list of approved debt buyers and unable to purchase debt from Citibank in the future. On May 28, 2020, Absolute and Citibank executed the Release.[10] (See Dkt. No. 15-3 (titled "FIRST AMENDMENT TO ADDENDUM NO. 2").)

As executed, the Release constituted an amendment to the March 2020 Addendum and specified that

> Buyer hereby releases and forever discharges Bank and its predecessors, agents, employees, successors, and assigns from all damages, costs, and liabilities relating to claims that (a) Bank violated Section 3.5 of the Addendum by using selection criteria adverse to Buyer, and (b) Bank breached the Addendum and/or the Agreement by suspending the sale of Accounts in April, 2020.

(See id.)

Other issues arose in connection with the March 2020 Sale. Like the October 2019 Sale, the March 2020 Sale

---

[10] The Release is incorporated by reference in the Complaint.

contained a lower percentage of higher-value accounts and a higher percentage of lower-value accounts than what Citibank had presented to Absolute in due diligence. Similarly, once again, the difference between Absolute's previewed accounts and the accounts it received did not correspond with purely random removal. In a letter dated June 16, 2020, Absolute conveyed to Citibank its concerns about the monthly sales flows.

In the Summer of 2020, Absolute participated in a second bidding process under the 2020 Master Agreement, this time for a six-month flow of accounts, with the initial batch of accounts to be transferred in September 2020. As before, Absolute received a due diligence package, including a seller survey (the "September 2020 Seller Survey," and together with the 2019 Seller Survey and the March 2020 Seller Survey, the "Seller Surveys"). (See Dkt. No. 19-1 (entitled "SELLER SURVEY – Citibank Costco Fresh Flow (180-Day)").) The September 2020 Seller Survey specified that "an estimated 10% of the sale eligible accounts may be retained by Citi[bank] from each month's delivery. Citi[bank] reserves the right to retain a higher percentage with notification prior to delivery. These accounts are randomly selected from the sale eligible pool."(Id.) Additionally, the September 2020 Seller

Survey contained the same variance disclaimer as found in the 2019 Seller Survey and the March 2020 Seller Survey. (See id.)

Absolute won the bid, and the parties executed an addendum on September 21, 2020 (the "September 2020 Addendum" and together with the October 2019 Addendum and the March 2020 Addendum, the "Addenda") to finalize the sale (the "September 2020 Sale").[11] (See Dkt. No. 21-2 (titled "Addendum No. 3 Costco Fresh – 180 Day Flow Sale").) The September 2020 Addendum also lacked the Special Provision language contained in the October 2019 Addendum but again included the disclaimer that the Addendum along with the Master Agreement "set forth the entire understanding of the Parties." (See id.)

The transfers then proceeded for the months of September, October, and November 2020. Absolute contends that the accounts Citibank transferred again contained a lower percentage of higher-value accounts and a higher percentage of lower-value accounts than what Absolute had previewed in due diligence. Further, Absolute claims that, once again, the difference between the accounts it previewed and those it received did not correspond with purely random removal.

---

[11] The September 2020 Addendum is incorporated by reference in the Complaint.

Sometime in the Fall of 2020, Absolute again contacted Citibank to address its concerns relating to the purchased accounts. Specifically, Absolute asked that Citibank provide information about the difference between the previewed and received accounts and explain other discrepancies. Absolute also requested that Citibank include the language from the seller surveys, stating that removed accounts "are randomly selected from the sale eligible pool," be included as a representation in the Master Agreements or in an addendum. Citibank refused both requests.

In December 2020, based on Citibank's refusal and Absolute's ongoing concerns, Absolute informed Citibank that it would pause its funding of further monthly flow sales. On January 15, 2021, Citibank notified Absolute that Absolute was in default of the 2020 Master Agreement because of the funding pause, that the 2020 Master Agreement was terminated, and that Absolute's status as a Citibank-approved debt buyer was terminated.

B.   <u>PROCEDURAL HISTORY</u>

Absolute initiated this action on January 21, 2022, in the Supreme Court of the State of New York, New York County. On March 14, 2022, Citibank removed the action to this Court on the basis of diversity jurisdiction under 28 U.S.C. Section

1441. Consistent with the Court's Individual Practices, on March 21, 2022, Citibank wrote a pre-motion letter to Absolute identifying alleged deficiencies in the Complaint that would provide its basis for a motion to dismiss. (See Dkt. No. 8-1.) On April 4, 2022, also consistent with the Court's Individual Practices, counsel for Absolute sent a letter in response, opposing the grounds that Citibank stated in favor of the proposed motion. (See Dkt. No. 8-2.)

On April 8, 2022, Citibank informed the Court that the parties had failed to resolve their dispute over the appropriateness of filing a motion to dismiss and requested that the Court schedule a conference to provide any preliminary guidance or rulings. (See Dkt. No. 8.) On June 24, 2022, the Court denied Citibank's request for a pre-motion conference, finding that a conference or further briefing was not necessary to resolve the parties' dispute. (See Dkt. No. 12.) The Court authorized Citibank to file a motion to dismiss, the substance of which was not to deviate from its initial pre-motion letter, to be followed by Absolute's opposition, and Citibank's reply, all being limited to three pages in length. (See id.)

On July 1, 2022, Citibank filed its Motion to Dismiss (the "Motion"), Memorandum of Law in Support (the

"Memorandum"), and Declaration of Priya Chadha in Support of the Memorandum. (See Dkt. Nos. 13-15.)

On July 15, 2022, Absolute filed its Memorandum of Law Opposing Citibank's Motion to Dismiss (the "Opposition") and accompanying Declaration of Yonaton Aronoff in Support. (See Dkt. Nos. 18-19.)

On July 29, 2022, Citibank filed its Reply in Support of the Motion to Dismiss (the "Reply") along with the Declaration of Priya Chadha in Support of the Reply. (See Dkt. Nos. 20-21.)

On August 9, 2022, the Court directed the parties to advise the Court on whether they consented to deem the briefing submitted pursuant to the Court's June 24 Order to be a fully briefed motion to be ruled on the basis of the limited briefs, or whether the parties requested supplemental or full briefing. (See Dkt. Nos. 12, 22.) On August 15, 2022, the parties informed the Court by email that neither party sought supplemental briefing and both parties consented to the Court deeming the briefing submitted pursuant to the Court's June 24 Order as a fully briefed motion to be ruled on the basis of the briefing submitted.

14

## II.  **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In other words, a complaint should not be dismissed when the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In resolving a Rule 12(b)(6) motion, the Court's task is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted), aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., No. 05 Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006); accord In re MF Glob. Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 302 (S.D.N.Y. 2013).

In this context, the Court must construe the complaint liberally, "accepting all factual allegations in the

complaint as true, and drawing all reasonable inferences in the plaintiff's favor." See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). A district court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). Additionally, "[o]n a motion to dismiss for breach of contract, courts look not only at the sufficiency of the complaint but also at the contract itself, which by definition is integral to the complaint." Axiom Inv. Advisors, LLC ex rel. Gildor Mgmt., LLC v. Deutsche Bank AG, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017). The requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions. See Iqbal, 556 U.S. at 678.

### III. DISCUSSION[12]

Absolute brought four claims against Citibank in the Complaint, alleging that Citibank engaged in fraud, negligent

---

[12] Section 12.7 of the Master Agreements specify that "[t]he laws of the State of South Dakota shall govern the enforcement and interpretation of this Agreement and the rights, duties and obligations of the parties hereto." (See Dkt. Nos. 15-1, 15-2.) Neither party disputes that South Dakota law applies, and the Court concurs.

misrepresentation, breach of contract, and in the alternative to the breach of contract, breach of the implied covenant of good faith and fair dealing. For the reasons explained below, the Court grants Citibank's Motion and dismisses all four claims without prejudice.

A. THE FRAUD CLAIM

The Complaint alleges that Citibank committed fraud through its "oral and written misrepresentations and omissions" "regarding the similarities between the due diligence file and the accounts to be transferred; the types and quality of the accounts to be transferred; and the method by which accounts were selected to be transferred to Absolute or (conversely) held back by Citi[bank]." (See Complaint ¶ 96.) The Complaint further alleges that "Citi[bank] had an affirmative duty to provide complete and accurate disclosures of the material facts about the debt portfolios to be transferred to Absolute, and about Citi[bank]'s process for selecting the accounts that would be transferred or withheld." (See Complaint ¶ 99.)

Citibank argues that Absolute's fraud claim must be dismissed on three separate grounds: (1) it is precluded by the Independent Tort Doctrine; (2) it is precluded by the Economic Loss Doctrine; and (3) it lacks the particularity

required by Federal Rule of Civil Procedure 9(b). (See Memorandum at 2-3.)

      a. THE INDEPENDENT TORT DOCTRINE

Under the Independent Tort Doctrine, "tort liability requires a breach of a legal duty independent of contract that arises from extraneous circumstances, not constituting elements of the contract." Knecht v. Evridge, 940 N.W.2d 318, 335 (S.D. 2020) (internal quotation marks and alterations omitted).

Citibank argues that Absolute's fraud claim is precluded by the Independent Tort Doctrine because it fails to "allege[] a breach of a legal duty independent of contract," while the "only duties that [Absolute] contends form the basis of its tort claims are the alleged failure (1) to disclose and (2) to properly select accounts . . . [b]ut these duties are defined in the Agreements, and nowhere else." (See Memorandum at 2-3.) Absolute argues that its fraud claim is not subject to the Independent Tort Doctrine because the claim "do[es] not arise out of a contractual relationship as Citibank asserts"; instead they "arise out of the written Seller Surveys[] provided to [Absolute]," and the "false statements" within "created an independent duty, the breaches of which

18

underlie [Absolute's] fraud [] claim[]." (<u>See</u> Opposition at 1-2).

Citibank responds that the "Seller Surveys do not create 'a legal duty . . . independent of the duties owed under the contract,' and exist only as part of the contracting process contemplated by the Agreements," noting how "[t]here is no mention of, or reference to, the seller surveys in the addenda." (<u>See</u> Reply at 2-3.) Citibank also notes that each of the mutually executed Addenda contained an integration clause stating that the "Addendum and the Master Agreement set forth the entire understanding of the Parties with respect to the subject matter hereof and supersedes to the extent indicated all prior agreements, letters, covenants, arrangements, communications, representations, whether oral or written by any representative of either party." (<u>See</u> <u>id.</u>)

The Court finds that Absolute's fraud claim is barred by the Independent Tort Doctrine.[13] As an initial matter, Absolute has not established the existence of a legal duty independent of the Master Agreements and Addenda, which form the basis of their breach of contract claims. Contrary to Absolute's assertions, the Seller Surveys did not create an

---

[13] The Court is not required to accept the Complaint's allegations regarding the existence of an independent legal duty because the "existence of a legal duty is a question of law." <u>Grynberg v. Citation Oil & Gas Corp.</u>, 573 N.W.2d 493, 501 (S.D. 1997).

independent legal duty on Citibank's part to "provide complete and accurate disclosures of the material facts about the debt portfolios to be transferred to Absolute, and about Citi[bank]'s process for selecting the accounts that would be transferred or withheld." (See Complaint ¶99)

The Seller Surveys are bookended by Master Agreements and Addenda in each case, that were fully executed by the parties, and which explicitly detail the representations and duties of the parties and disclaim any understanding of the parties beyond those documents. Moreover, that Absolute sought the inclusion of language from the Surveys that it now relies on, and that Citibank refused its inclusion, further undermines the notion that the Seller Surveys created a legal duty independent of the Master Agreements and Addenda.

Nor does the Court identify any other source of an independent legal duty to distinguish Absolute's fraud claim from its contract claims. This deficit is no surprise given that the alleged fraud goes directly to the alleged breach of contract; the product delivered differed from Absolute's expectations. Accordingly, Absolute's fraud claim is dismissed, and the Court need not reach whether dismissal is warranted under the Economic Loss Doctrine or Federal Rule of Civil Procedure 9(b).

B. <u>THE NEGLIGENT REPRESENTATION CLAIM</u>

The Complaint alleges that Citibank made negligent misrepresentations "regarding the characteristics of the debt accounts in its possession and its methods for selecting accounts that would be transferred to Absolute." (<u>See</u> Complaint ¶ 106.) The Complaint further alleges that Citibank "had a duty to Absolute to exercise reasonable care in providing information about the debt accounts it would transfer to Absolute, and how those accounts would be selected for transfer or to be withheld." (<u>See</u> <u>id.</u> ¶ 105.)

Similar to the fraud claim, Citibank argues that Absolute's negligent misrepresentation claim must be dismissed on two separate grounds: (1) it is precluded by the Independent Tort Doctrine; and (2) it is precluded by the Economic Loss Doctrine. (<u>See</u> Memorandum at 2–3.) Absolute again argues that both doctrines are inapplicable to its negligent misrepresentation claim because the claim "arise[s] out of the written Seller Surveys[] provided to [Absolute,]" and "do[es] not arise out of a contractual relationship as Citibank asserts." (<u>See</u> Opposition at 1–2.)

The Court finds that its reasoning discussed above regarding Absolute's fraud claim applies in equal measure to the negligent misrepresentation claim. Application of the

Independent Tort Doctrine warrants dismissal of this claim because Citibank lacked a legal duty to Absolute independent of the contract underpinning this claim. Accordingly, Absolute's negligent misrepresentation claim is dismissed, and the Court need not address whether dismissal would be warranted under the Economic Loss Doctrine.

C. <u>THE BREACH OF CONTRACT CLAIM</u>

The Complaint alleges that Citibank "materially breached its contractual obligations to Absolute" by "removing batches of high-value accounts prior to [their transfer to Absolute]" despite there being no basis for such removal in the Master Agreements or the Addenda. (<u>See</u> Complaint ¶¶ 109, 119.)

Citibank argues that Absolute's breach of contract claim must be dismissed because "[Absolute] did not follow the [Master] Agreements' specific notice provisions [found in Section 3.4 of the Master Agreements], which serve as a precondition to suit" and because "[Absolute] released its claims (in tort and contract) relating to the October 2019 and March 2020 sales." (<u>See</u> Memorandum at 1-2.)

a. <u>THE PRE-SUIT NOTICE REQUIREMENT</u>

Section 3.4 of the Master Agreements, titled "Remedies for Breach of Representations Concerning Accounts," specifies that

22

Buyer's sole remedy against Bank, other than indemnification per Article 10.2, for a breach of any of the representations listed in Article 3 shall be to notify the Bank of the breach ('Notice of Claim') no later than 180 days from the applicable Closing Date. . . . A Notice of Claim under this Section 3.4 must be delivered by the Buyer to the Bank in writing or in electronic format and accompanied by the documentation required under Section 3.4(b). The Buyer's failure to provide a Notice of Claim with respect to any claimed breach of Bank as provided in this Section 3.4 shall terminate and waive any rights Buyer may have to any remedy for breach of this Agreement with respect to such Account.

(See Dkt. No. 15-1 at 6; Dkt. No. 15-2 at 6.) Additionally, Section 12.3, titled "Notices," specifies that "[a]ll notices or other documents required to be given pursuant to this Agreement shall be effective when received and shall be sufficient if given in writing, hand delivered, sent by overnight air courier or certified United States mail, return receipt requested" to the general counsel of Citibank at a specified address. (See Dkt. No. 15-1 at 17; Dkt. No. 15-2 at 18.)

Citibank argues that Absolute "has not alleged—and cannot allege—that it complied with the specific, pre-suit notice requirements found in Section 3.4 of the Agreements," that specify that "[b]uyer's failure to provide a Notice of Claim . . . as provided in this Section 3.4 shall terminate and waive any rights Buyer may have to any remedy for breach

of this Agreement with respect to such Account." (<u>See</u>
Memorandum at 1-2.)

Absolute counters that "Section 3.4 applies only to the
*representations* in Article 3, none of which are invoked in
support of [Absolute]'s claim," while Absolute's "claim is
premised upon the *covenant* in Section 3.5: '[e]xcept as
disclosed in the final electronic file, Citi[bank] will not
employ any selection criteria, materially adverse to the
interest of the Buyer, in selecting the Accounts sold to the
Buyer hereunder.'" (<u>See</u> Opposition at 2-3 (alterations in
original).) Absolute contends that Section 3.5 is a covenant
because it "contains an undertaking with respect to future
conduct," in contrast to "Sections 3.3.1 and 3.3.2" that
"contain statements of present fact (*i.e.*, representations)
concerning the transferred accounts." (<u>See</u> <u>id.</u>) As a fallback
position, Absolute argues that even if the notice provision
applies, Absolute "did, in fact, repeatedly notify Citibank
of the issues involving improper holdbacks," as alleged in
the Complaint. (<u>See</u> Opposition at 3; Complaint ¶¶ 65, 68, 78,
79, 81.)

The Court finds that Absolute's breach of contract claim
is barred by its failure to adhere to the process set forth
in Section 3.4 of the Master Agreements. Absolute's

contention that Section 3.5 was a covenant and not a representation, such that any breach of it was not subject to the process in Section 3.4, is not supported by the language of the Master Agreements.

Article 3 is titled "REPRESENTATIONS AND WARRANTIES OF THE BANK." Within Article 3, Section 3.5 is not distinguished in any way from the other subsections or otherwise carved out, and Section 3.4 applies to "a breach of any of the representations listed in Article 3" with the only exceptions not implicating Section 3.5. (See Dkt. No. 15-1 at 6; Dkt. No. 15-2 at 6.) Indeed, that Section 3.4 has other exceptions demonstrates that the drafters considered what provisions would be subject to the process identified and chose to not treat Section 3.5 differently. As Learned Hand wrote as a Second Circuit Judge almost 90 years ago, "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." James Baird Co. v. Gimbel Bros., 64 F.2d 344, 346 (2d Cir. 1933).

The Court is similarly not persuaded by Absolute's assertion that it complied with Section 3.4 because the Complaint "alleges that [Absolute] did, in fact, repeatedly notify Citibank of the issues involving improper holdbacks"

25

through its June 16, 2020 letter to Citibank and its communication with Citibank in the Fall of 2020. (See Opposition at 3.) The Complaint merely alleges that Absolute sent Citibank a letter dated June 16, 2020, and also contacted Citibank in an unspecified manner at an unspecified date sometime in the Fall of 2020, in each case allegedly to complain about the accounts Citibank had transferred and raise other concerns. (See Compl. at ¶¶ 65, 68, 78, 79.) The Complaint does not express how either communication satisfied the specific requirements set forth in Section 3.4, nor has a copy of either communication been provided to the Court with which it could assess the communications.[14]

Accordingly, Absolute's breach of contract claim is dismissed, and the Court need not reach whether the Release precludes Absolute's breach of contract claim as to the October 2019 and March 2020 Sales.

---

[14] Contrary to Absolute's assertion that consideration of the notice provision in the Master Agreements "improperly inject[s] issues of fact into a motion to dismiss," "[u]nder the Federal Rules, a plaintiff is required to allege generally that all conditions precedent have occurred or been performed" and "[f]ailure to allege, even generally, that a condition precedent was performed or has occurred warrants dismissal." (See Opposition at 3); Rojas v. Don King Productions, Inc., No. 11 Civ. 8468, 2012 WL 760336, at *2 (S.D.N.Y. Mar. 6, 2012) (internal quotation marks omitted). Absolute has made no such allegation here.

D. <u>THE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND
FAIR DEALING CLAIM</u>

The Complaint alleges that "[i]nasmuch as the Court determines that Citi[bank] could permissibly holdback [sic] accounts, the selective manner in which Citi[bank] held back those accounts to Absolute's detriment violated the implied covenant of good faith and fair dealing and robbed Absolute of the benefit of its bargain." (<u>See</u> Complaint ¶ 127.)

Citibank argues that Absolute's claim for breach of the implied covenant of good faith and fair dealing "fails because South Dakota does not recognize this claim as an independent tort, and the claim, therefore, should be dismissed as it is subsumed within [Absolute's] breach of contract claim." (<u>See</u> Memorandum at 3.) Citibank further argues that Absolute "disclaimed any implied covenants" in the Master Agreements and Addenda, which provide that they are "the entire agreement and understanding between the parties" and that Citibank "makes no other representations or warranties, express or implied." (<u>See</u> Memorandum at 3.) Citibank notes in support that "South Dakota courts have enforced a nearly identical disclaimer of 'all implied covenants or obligations' when dismissing a claim for breach of the implied covenant of good faith and fair dealing." (<u>See</u> Memorandum at 2; Reply at 3.)

27

Absolute responds that it has asserted the breach of implied covenant of good faith and fair dealing claim in the alternative to its breach of contract claim, which is permissible under South Dakota law. (See Opposition at 3.) Absolute also argues that the merger clauses in the Master Agreements and Addenda "do not contain any disclaimer of the implied covenant of good faith and fair dealing."(See id.)

As an initial matter, the Court finds that a claim for breach of the implied covenant of good faith and fair dealing may be brought as a breach of contract claim. See e.g., S.D. Bd. of Regents ex rel. Black Hills State Univ. v. Glob. Synthetics Env't, LLC, 270 F. Supp. 3d 1088, 1104 (D.S.D. 2017). Though Citibank is correct that South Dakota does not recognize an independent tort action for breach of the implied covenant of good faith and fair dealing, every contract under South Dakota law "contains the implied covenant of good faith and fair dealing," that "allows either party to sue for breach of contract even though the conduct failed to violate any of the express terms of the contract agreed to by the parties." See id.; Mahan v. Avera St. Luke's, 621 N.W.2d 150, 160 (S.D. 2001) (internal quotation marks omitted). Thus, under South Dakota law, Absolute's implied covenant claim is considered just as a species of breach of contract claim.

Nonetheless, the Court agrees with Citibank that Absolute's implied covenant claim is subsumed within its breach of contract claim, as the implied covenant claim is duplicative of the breach of contract claim. The implied covenant claim derives from the same underlying alleged conduct as the breach of contract claim: Citibank's failure to deliver batches of accounts to Absolute that were consistent with what was previewed to Absolute during due diligence. (Cf. Compl. at ¶¶ 117-19; 124-26.) Absolute has not claimed, for example, that Citibank violated the implied covenant of good faith and fair dealing in other ways, such as refusing to provide Absolute with the information it requested regarding the removal of accounts from the monthly sale files.

Accordingly, Absolute's implied covenant claim is dismissed, and the Court need not reach whether the merger clauses in the Master Agreements and the Addenda would enable a wholesale waiver of the implied covenant of good faith and fair dealing.

## IV.  **ORDER**

For the reasons stated above, it is hereby

**ORDERED** that the motion filed by defendant Citibank, N.A. (Dkt. No. 13) to dismiss the Complaint of plaintiff Absolute Resolutions Investments, LLC ("Absolute") (Dkt. No. 1-1) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **GRANTED** in its entirety, and Absolute's claims are dismissed without prejudice to Absolute's filing an amended complaint within 21 days of the date of this Order.

**SO ORDERED.**

Dated:      New York, New York
            29 December 2022

                                    _____
                                        Victor Marrero
                                           U.S.D.J.

30