UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

|  |  |
|---|---|
| ABSOLUTE RESOLUTIONS INVESTMENTS, LLC, | ) ) ) Case No. 22-cv-2079-VM |
| Plaintiff, | ) ) ) **FIRST AMENDED COMPLAINT** |
| vs. | ) ) ) ) |
| CITIBANK, N.A., | ) ) |
| Defendant. | ) ) ) ) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff Absolute Resolutions Investments, LLC (together with its affiliates, referred to herein as "Absolute"), by and through its undersigned attorneys, for its First Amended Complaint against defendant Citibank, N.A. ("Citi"), hereby alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of contract and the implied covenant of good faith and fair dealing arising out of Citi's flagrant violations of the parties' agreements, which caused Absolute significant damages and completely undermined Absolute's reasonable commercial expectations.

2.     Since October 2019, Absolute has paid Citi approximately $23 million for portfolios of delinquent, charged off consumer credit card accounts under various agreements.

3.     Absolute's business is to acquire and manage charged-off debt from primary creditors. Absolute acquires debt by purchasing portfolios presented by entities such as Citi after being provided with due diligence files selected by Citi, which are supposed to accurately represent the types of accounts to be included in the portfolios.

1

4.      Consumer debt portfolios are constantly in flux as individual accounts within portfolios are paid off, accrue charges, or otherwise change. Thus, the due diligence files typically show certain key characteristics of the debt portfolios Absolute is to purchase, rather than a snapshot of the exact accounts to be transferred to Absolute in connection with the debt purchases. Based upon those characteristics, using its proprietary modeling, Absolute is able to project a range of expected outcomes to a reasonable degree of certainty.

5.      In this case, to ensure that the portfolios Absolute purchased from Citi would be as valuable as the accounts previewed in the due diligence files, Citi agreed that: (1) the contents of portfolios received would be substantially similar to the contents of the previewed portfolios; and (2) Citi would not apply the criteria used to select the accounts that would actually be transferred in a manner that would adversely impact Absolute.

6.      In 2019, following a change in management, Citi – wholly unbeknownst to Absolute – suddenly began self-selecting accounts in a manner adverse to Absolute, withholding accounts with more favorable characteristics and substantially degrading the quality of the portfolios being transferred to Absolute.

7.      As Absolute began to process, manage, and collect on debt in the new portfolios, Absolute began to notice and question Citi about disparities between what was promised and what was received. Rather than meaningfully respond to Absolute's inquiries, Citi obfuscated, using the COVID-19 pandemic as cover. Not only that, but in the spring of 2020, Citi demanded Absolute sign a release absolving Citi of liability for any previous adverse account selection as a condition for Absolute to remain on Citi's list of approved debt purchasers. Reasoning in part that Citi would cease its adverse selection now that it had been "caught," Absolute executed the release in May 2020.

8.     But Citi did not stop. Instead, it continued transferring portfolios of substantially degraded quality and value compared to what had been previewed to Absolute in due diligence, and continued refusing to respond to Absolute's inquiries into the matter.

9.     By "cherry picking" accounts out of the transferred portfolios, Citi breached its agreements with Absolute and wholly undermined the spirit of the parties' bargain.

10.     As a result of Citi's repeated breaches and malfeasance, Absolute has suffered millions of dollars in losses.

## THE PARTIES

11.     Absolute Resolutions Investments, LLC is a limited liability company organized under the laws of the State of Arizona with its principal place of business in Bloomington, Minnesota.

12.     Upon information and belief, Citibank, N.A. is a national banking association organized under the laws of the United States with its principal place of business at 399 Park Avenue, New York, New York 10043.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendant because it maintains its principal office and transacts business in this District.

14.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because (i) this is an action between citizen of different States, and (ii) the matter and controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

15.     Venue lies in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

# FACTS

## Citi's Debt Sale Process

16.     For approximately twenty years Absolute and its affiliates have been in the business of acquiring and managing charged-off debt from primary creditors, including a broad range of financial institutions. Absolute uses sophisticated proprietary analytics to evaluate debt portfolios for purchase and to maximize the collectability of the portfolios it acquires.

17.     Citi's business includes branded and retail credit card products and services. In addition to offering Citibank-branded cards, Citi also has an arm called "Citi Retail Services," through which it partners with retail brands—*i.e.*, Costco, Macy's, and Best Buy—to provide private label and co-branded cards and services.

18.     Citi maintains a list of approved outside buyers to which it markets certain portfolios of delinquent consumer credit card accounts. Third-party buyers are not provided clear and articulated grounds for obtaining approval or why their approval may be revoked, and the process appears to be infected by favoritism and cronyism.

19.     Citi sells off batches of delinquent and charged-off credit card accounts to qualified third-party buyers or places them at a collection agency for Citi's benefit.

20.     At all relevant times herein, the process has worked as follows: upon information and belief, Citi sells certain charged-off accounts in "bulk" and others—such as the accounts at issue here and as detailed below—pursuant to a multi-month "flow" of sales with an initial due diligence phase.

21.     Upon information and belief, in either scenario, Citi first groups charged-off accounts according to certain common characteristics, such as whether they consist of Citi-branded or retail consumer (*e.g.*, Costco) credit card accounts (or both), and other common features, such

as the age of the debt (*e.g.*, accounts labeled "Early Out" are recently charged-off accounts that were recalled from pre-charge off collection agencies, including debt settlement account servicers).

22.     After bundling the charged-off accounts Citi initiates a bidding process. As part of that process, prospective buyers are given a sample portfolio to assist them in pricing their bids. The sample portfolio contains account-level information about the debt accounts to be included in the first month of the sale flow, such as the amount owed by the debtor (*i.e.*, the "charge-off balance"), the charge-off date, last payment date, whether there has been a first payment default, the state of residence of the account holder, and other important information about the account.

23.     The sample portfolio provided by Citi is "masked," meaning that most consumer-specific information is redacted from the file.

24.     For a buyer to perform due diligence on a portfolio, the buyer must utilize the services of a third party identified and approved by Citi, which is provided the "unmasked" portfolio information from Citi and assists the prospective buyer in scoring the portfolio to determine how much to bid.

25.     Accordingly, based on the portfolio information, a prospective buyer is able to see key characteristics of the accounts that inform the buyer (based on its internal analysis) of the expected performance of those accounts, which is used and relied upon by the buyer in determining whether and how much to bid. Those key characteristics include (among other things) the collectability score; the amount of outstanding debt on each account; the state in which each account holder resides; and whether the account is eligible for assistance from a debt settlement company.

26.     Along with the sample portfolio, upon information and belief, prospective buyers are also sometimes provided a Seller Survey by Citi. The Seller Survey provides additional portfolio-specific information, including the types of accounts to be contained in the sales flow and other characteristics of the portfolio.

27.     Upon information and belief, Citi typically covenants that the accounts sold will be "substantially similar" to the accounts contained in the due diligence file "in all material scoring characteristics."[1] In other words, the key account characteristics in the sales flow portfolios should match, in all material respects, the key account characteristics in the sample portfolio that is presented to bidders such as Absolute to solicit their bids.

28.     Even modest changes in the characteristics of the debt can affect the price Absolute is willing to pay for the portfolios in the first instance, and the amount Absolute ultimately is able to recover on the debt after purchase. Accordingly, Absolute employs carefully refined and proprietary analytics to determine, based on the aggregate characteristics of the due diligence file, how much it will pay for each set of accounts released in the subsequent monthly sales flow.

29.     After the diligence period Citi opens bidding to prospective buyers. The bidding is supposed to be "blind"—*i.e.*, prospective buyers are not supposed to be aware of each other's identities or other key bidding information (such as bid amounts)—and the portfolio is supposed to be awarded to the highest qualified bidder.

30.     Through this process, prospective buyers are bidding on a sale offering consisting of a "forward flow" (or sales flow) of accounts to be released and sold over a period of consecutive months, as delinquent accounts become newly charged off. This procedure relieves Citi of having

---

[1] In this case, Citi made that covenant in Master Agreements between Absolute and Citibank, which are described herein.

to initiate a new auction each month. Buyers such as Absolute bid on a multi-month flow of accounts, in which each monthly batch received thereunder should consist of accounts that (i) have reached at least 180 days of delinquent status during the preceding month; and (ii) bear substantially the same material characteristics as those reflected in the sample portfolio provided during the due diligence period.

31.     Citi reserves the right to remove from the forward flow any accounts that are legally ineligible for sale, such as where the account holder has died or declared bankruptcy.

**Absolute Re-Qualifies as a Bank Customer and Steven Dasch Becomes Head of Recoveries**

32.     Absolute purchased its first portfolio directly from Citibank in about 2006 and was a consistent buyer of credit card portfolios from Citibank from 2011 through 2015.

33.     In 2016, Absolute's status as an approved buyer was revoked by Citi by the Head of Recoveries at the time, Michael Taulbee, for reasons that were never fully explained.

34.     Upon information and belief, Taulbee's employment with Citi was terminated in late 2018 or early 2019. Shortly after Taulbee's termination, Absolute was invited to apply for re-approval.

35.     Absolute went through the approval process and was requalified in July 2019.

36.     Upon information and belief, in or about October of 2019, Steven Dasch was Head of Operations and his role was expanded to include control over Citi's debt sales process—the role which Taulbee previously had held (with another individual holding that role in the interim).

37.     Upon assuming his new role, upon information and belief, Dasch was given supervisory authority over: the decision whether to place accounts with outside bidders versus agencies and law firms (and, in the latter instance, the specific agencies and law firm recipients); the procedures governing outside bidding (including whether to sell portfolios in quarterly

increments or pursuant to a multi-month sales flow); and the processes by which accounts were removed from portfolios prior to sale.

38.     Importantly, Citi had not always used a quarterly (3-month) sales flow structure for its charged-off debt sales. Before Dasch took over from Taulbee, Citi conducted its quarterly sales as one-time bulk offerings. It was Dasch who switched Citi over to the flow structure, which gave Citi the opportunity to start cherry-picking accounts to hold back in connection with each sales flow.

39.     Upon information and belief, Messrs. Taulbee and Dasch were and remain close acquaintances.

40.     Also upon information and belief, while Dasch previously had been unknown to Absolute, he had close relationships with other qualified buyers. Among other examples, Taulbee's wife works at Cavalry Portfolio Services ("Cavalry") and Taulbee works (or worked) at United Holdings Group ("UHG"). Upon information and belief, Cavalry and UHG are two of the most frequent Citi-approved buyers of Citi's consumer debt portfolios.

41.     Upon information and belief, Dasch was terminated from Citi after this action was filed.

42.     Upon information and belief, Citi's internal compliance processes and controls were wholly insufficient to prevent employees in the Operations group—including Dasch—from culling more favorable accounts from forward-flow batches before those batches were transferred to third-party buyers, or from re-routing more favorable accounts to preferred buyers, law firms, or collection agencies (including agencies servicing debt settlement accounts).

**Defendants And Absolute Enter Into Agreements To Purchase and Sell Debt Accounts**

43.     After Absolute's re-approval in July of 2019, Citi and Absolute entered into a Master Purchase and Sale Agreement dated July 25, 2019 (the "2019 Master Agreement"). Subsequently, the parties executed a similar Master Purchase and Sale Agreement dated March 9, 2020 (the "2020 Master Agreement" and together with the 2019 Master Agreement, the "Master Agreements").

44.     The two Master Agreements contain nearly identical material terms and conditions, including those terms and conditions under which Citi would sell forward-flow accounts to Absolute. The Master Agreements each contemplate that Citi would "sell, assign and transfer to [Absolute]," and Absolute would agree "to purchase from Citi on the Closing Date all right, title and interest of Bank in and to the Accounts as specified in an Addendum." Citi and Absolute executed an addendum in connection with each portfolio sale made pursuant to the Master Agreements (*see infra*).

45.     Section 3 of the Master Agreements contains provisions central to this dispute. Section 3 is preceded by the heading "REPRESENTATIONS AND WARRANTIES OF THE BANK," but the Agreements provide elsewhere (in Section 12.11) that "[h]eadings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement."

46.     The heading of Section 3 is not in fact accurate, because the provisions of Section 3 are not limited to representations and warranties. Section 3 also includes forward-looking covenants, as well as a section concerning available remedies in the event that Citi breaches certain provisions of Article 3.

47.     The representations and warranties of Article 3 are contained in subsections 3.3.1 ("Representations Concerning Accounts") and 3.3.2 ("Additional Representations and Warranties of Bank"). In relevant part, Citi represented in subsection 3.3.1(i) that "the information provided by [Citi] on the due diligence file is substantially similar to the final electronic file provided to Buyer in connection with the closing . . . ." Subsection 3.3.2 clarifies that Citi "**makes no other representations or warranties**, express or implied, with respect to any of the Accounts **other than as specifically set forth in this Section 3.3**" (emphasis added).

48.     Section 3.4 establishes Absolute's "sole remedy against the Bank . . . for a breach of any of the representations listed in Article 3." Section 3.4(a), given the heading "Time Period," provides that within 180 days of a sale closing, and upon timely notice, Citi may elect between (i) curing the breach and (ii) repurchasing the affected accounts. This 180-day period is a standard industry clause commonly known as a "put-back period." The purpose of the "put-back period" is to give purchasers like Absolute a window of time to identify defective accounts that should not have been included in the sale and then ask the seller to repurchase those accounts. This is a logical remedy for breach of the representations in Sections 3.3.1 and 3.3.2. For instance, if Citi transferred accounts that had been paid in full or discharged through bankruptcy, or for which the obligor was deceased (*see* §§ 3.3.1(a), (e), and (f)), Absolute would simply notify Citi of the defects in those accounts and Citi would repurchase the accounts.

49.     Section 3.4 also provides that notice must be made "in writing or in electronic format and accompanied by the documentation required under Section 3.4(b)." Section 3.4(b), in turn, requires a detailed, account-level list of "each Account [ ] which [Absolute] seeks to have [Citi] repurchase."

50.     Section 3.5, which follows the "remedies" section in 3.4, does *not* contain a representation or a warranty or a remedy restriction. Rather, in Section 3.5, Citi made a covenant regarding its future performance:

> No Adverse Selection. Except as disclosed in the final electronic file, [Citi] will not employ any selection criteria, materially adverse to the interest of Buyer, in selecting the Accounts sold to the Buyer hereunder.

51.     Beyond Section 3, Section 2.2 of the Master Agreements sets forth a "Pre-Closing Adjustment" process by which the ultimate purchase price for accounts transferred thereunder would be adjusted to reflect two possible situations: (i) a change in the balance of a particular account as compared to what was reflected in the due diligence file; or (ii) retention by Citi of any accounts which either failed to comply with the representations made in Section 3.3, or as to which "[Citi] determines that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to" such account. Per the Master Agreements, "The Purchase Price will be adjusted by the amount associated with any balance or Account described above. [Citi] will notify the Buyer of the adjusted Purchase Price prior to the Closing Date."

52.     Section 12.1 provides that the interpretation and the rights, duties and obligations of the parties are controlled by South Dakota law.

**Problems Arise With Sales Flow Debt Portfolios**

53.     In October of 2019 Absolute participated in a bidding process for a four-month Citi Brands and Costco "Early Out" forward flow pursuant to the 2019 Master Agreement. In connection with that process Absolute received from Citi a due diligence file containing a sampling of the accounts to be offered in the forward flow. Citi also provided Absolute and other bidders with a "Seller Survey" as part of the bid package.

54.     The "Seller Survey" purported to contain additional information concerning the accounts subject to sale, such as the total number of accounts being offered for purchase (19,597) and certain details concerning the pre-charge-off collection activity on the accounts.

55.     The "Seller Survey" contained the following question and answer under the heading "General Information":

> Will a population of accounts be retained by Citi?
>
> *Yes, up to 10% of the sale eligible accounts will likely be retained by Citi from each month's delivery, but reserve the right to withhold up to 20%. These accounts are randomly selected from the sale eligible pool.*

56.     Upon information and belief, the supposedly "random" removal of accounts by Citi was designed to act as a "control" process whereby Citi could compare the performance of the accounts it retained to the value it realized from a sale. By randomly selecting a small group of accounts to hold back from the sale file and placing those accounts with a collection agency to collect on Citi's behalf, Citi could evaluate whether it made sense to continue to sell certain species of accounts to third-party buyers such as Absolute versus placing them with outside collection agencies, law firms, or debt settlement servicing agencies.

57.     However, this "control" process also provided Citi an opportunity and pretext to "cherry pick" higher-quality accounts, despite its statement that the selection and removal process would be randomized.

58.     Citi thereafter advised Absolute that Absolute was the successful bidder for the four-month forward flow beginning in October 2019. Citi issued an Addendum covering that forward flow, which was entitled "October 2019 Brands and Costco Early Out 120 Day Flow Accounts."

59.     The Addendum contained an asset schedule and the specific purchase price and confirmed that the forward flow would consist of four consecutive months of account sales beginning on or before October 30, 2019.

60.     The Addendum contained the following language under the heading "Special Provisions": "Each data file delivered by [Citi] to the Buyer during the term of this Agreement shall be substantially similar to the data file on which Buyer based its bid in all material scoring characteristics."

61.     It is well known and commercially expected in Absolute's industry—and was known to both Absolute and Citi during the relevant time period—that "material scoring characteristics" include, among others, the amount of outstanding debt on each account; the state in which each account-holder resides; and whether the account is currently enrolled with a debt settlement company.

62.     Thereafter, Citi sold to Absolute the four-month forward flow ("FF1") consisting of four consecutive monthly batches with the following transfer dates:

    (1)     October 30, 2019 (Purchase Price $2,805,102)

    (2)     November 26, 2019 (Purchase Price $3,466,460)

    (3)     December 30, 2019 (Purchase Price $2,728,259)

    (4)     January 24, 2020 (Purchase Price $3,008,372)

63.     Each monthly portfolio of accounts received by Absolute turned out to be different—and worse—than what Absolute had bid upon, to a statistically significant degree.

64.     For example, Citi provided information to Absolute for a total of 4,468 accounts (with balances of nearly $25 million in total), in order to evaluate the potential purchase of the October 2019 portfolio of accounts. Of these accounts, 2,367 (53%) were identified by Absolute

as higher-value accounts, a category which includes, for instance, accounts subject to creditor-advantageous collection states and accounts qualifying for debt settlement company assistance.

65.     However, the final file provided to Absolute was missing 649 of the 4468 accounts previewed during due diligence (14.5%). Of the 649 removed accounts, 64% (414) were high-value accounts, while only 51% (1,953 of 3,819) of the remaining accounts were high-value accounts. As a result, the portfolio ultimately sold to Absolute in October 2019 contained a materially *lower* percentage of higher-value accounts and a materially *higher* percentage of lower-value accounts than what had been previewed in due diligence.

66.     Statistical analysis reveals that the higher value accounts were not simply removed at "random." Had that been the case, approximately 53% of the removed accounts would have been high value accounts, as opposed to the 64% actually removed. In particular, standard statistical analysis indicates that had the accounts been removed at random, only rarely would more than 366 high value accounts (or less than 321) have been removed. The 414 actually removed falls well outside this range.

67.     Though disappointed in the profile of the October 2019 portfolio, Absolute hoped and expected that the remaining months of the FF1 flow would profile as promised. Instead, however, the November 2019, December 2019, and January 2020 portfolios also were worse than the due diligence file to a statistically significant degree.

68.     For the first month of the sales flow (October 2019) Citi provided information on the number and types of accounts removed prior to sale. However, Citi suddenly stopped providing this information, making it more difficult for Absolute to determine the types of accounts Citi was removing before transferring the sales flow accounts each month.

69.     As depicted in the following chart, Absolute now expects to recover millions less than it spent to acquire the FF1 portfolios, as opposed to the multiple it typically realizes:



70.     Subsequently, Citi sold to Absolute two additional forward flows under the 2020 Master Agreement ("FF2" and "FF3").

71.     FF2, the earlier of these two 2020 forward flows, consisted of Citi Brands and Costco "Early Out" accounts with the following transfer dates and purchase prices, each governed by the terms of the 2020 Master Agreement as well as an applicable Addendum:

    (1)     March 30, 2020 (Purchase Price $2,890,541)

    (2)     May 29, 2020 (Purchase Price $3,402,229)

72.     Absolute would typically receive data on the actual portfolio a few days before the date of the portfolio transfer.

73.     Because of concerns with the earlier portfolios, Absolute immediately analyzed the March flow data upon receipt.

74.     On March 30, 2020, Absolute wrote to several individuals at Citi and requested a phone call to discuss concerns with the portfolio that had been received three days earlier.

75.     Later that day, Absolute wrote to Citi:

Attached is a list of the accounts we believe were removed in a disproportionate rate to our high scoring accounts.

Additionally, our top two legal buckets were removed at twice the rate of the bottom two buckets. These are summary metrics based on the nature of our processes, but would include higher balances (over $12k), this was 368 accounts.

This will have a very big impact on our returns on this file to the tune of $1.3M+ (conservative estimate based on historical data) and would like to know why these accounts were removed.

76.     Citi did not provide any written response.

77.     Statistical analysis has since demonstrated that for the FF2 first month's file (March 2020), Citi removed 909 of the 5574 accounts previewed during due diligence (16.3%). Of those removed accounts, 68% of them were higher-value accounts, including 16% of the accounts eligible for *both* debt settlement company assistance and legal enforcement ("DSC Overlap") – historically the highest-liquidating accounts. As a result, the portfolio sold to Absolute in March 2020 contained a materially *lower* percentage of higher-value accounts and a materially *higher* percentage of lower-value accounts than what had been previewed in due diligence.

78.     In April 2020, after providing initial data on the next sales flow portfolio, Citi abruptly advised Absolute that all flows were being suspended purportedly due to the COVID-19 pandemic, and refused to sell Absolute a file for that month. However, other buyers reported to Absolute at the time that their closings were proceeding as planned. Upon information and belief, this was an arbitrary decision by Citi to penalize Absolute for inquiring into the portfolio discrepancies.

79.     On April 27, 2020 Absolute sent Citi the following email:

We analyzed the portfolio you sent over late Thursday last week and we have several of the same concerns that we need to address. Does 9AM PST work for you? Why did you remove the 8 states you said you were going to include after we talked? This file is not anywhere near characteristic to the initial bid file and why are you taking out 8 states when you are placing them to contingency and DSC agencies? You guys just keep burying yourselves with breach after breach. . . . I had a very clear conversation with you last week about the portfolio being representative of the initial due diligence file. I know exactly what is going on internally at Citibank since the new regime has taken over (Steve Dasch, etc). **. . . Per the contract you are obligated to furnish in a forward flow a materially similar file to the due diligence file.** Instead, last minute you delivered us the actual sale file which was significantly degraded from the initial due diligence file that we submitted the bid price of []% for a 3 month forward flow. The group you work for at Citibank cherry picked the "high value" accounts between the bid date and [ ] a couple days before funding which was an unusually high number of days between the due diligence period and the actual funding date. . . .

This deliberate and highly unethical practice is something I have never seen in my 20+ years in this industry with a highly valued and reputable bank in Citibank. . . .

80.     Citi again did not respond in writing, instead proposing a call to discuss. On that call Citi would not address the discrepancies between the due diligence file and what was actually transferred to Absolute; rather, Citi simply informed Absolute that Citi would not be transferring any accounts to Absolute for April 2020.

81.     The problems continued when sales resumed the following month. Among other issues, the May 2020 file included accounts that had been charged off in January, February, March, and April, despite being promoted as a flow of "early out" accounts.

82.     Rather than substantively respond to Absolute's repeated inquiries, in May 2020 Citi insisted, for the very first time, that Absolute execute a release in order to proceed with the May 2020 closing. Citi drafted the release expressly to cover "all damages, costs, and liabilities

relating to claims that [Citi] violated Section 3.5 of the Addendum."[2] Citi implied that, absent such a release, Absolute would be dropped as an approved debt buyer and prohibited from purchasing debt portfolios from Citi in the future. Left with little choice, Absolute executed the requested release.

83.     Absolute construed Citi's demand for a release as a tacit admission and hoped that, having been "caught," Citi would resolve the issue going forward. Nevertheless, to ensure its position was perfectly clear, Absolute sent to Citi a letter dated June 16, 2020 to reiterate Absolute's concerns with the monthly sales flows, including what appeared to be the removal of higher-value accounts. Among other things, Absolute used the March 2020 account sale as an example to demonstrate that Citi had been engaging in improper "holdbacks" of accounts:

> . . . not only was the "Holdback" considerably larger and not consistent with [Citi's] policy and procedure to exclusively hold back FEMA identified accounts, accounts where media couldn't be adequately supplied and other accounts that could present regulatory risk for the bank from the prior file (18% vs. 10%). . . . it became quite evident and undeniable that the Holdback was adversely selected. Approximately 750 of the 900+ accounts included in the Holdback were high value accounts either from historically valuable states that were legal eligible or accounts where a consumer was represented by a debt settlement company. It is statistically impossible to have that many high-value accounts removed at random . . .

84.     Then, in the summer of 2020, Absolute bid on another forward flow of accounts (FF3) consisting of Citi Brands and Costco "Fresh" accounts. The label "fresh" was significant to Absolute, as "fresh" is an industry term for accounts that have just become charged off and have not yet been "worked" by outside agencies—in other words, the highest-performing accounts. Absolute bid on the "fresh" portfolio (rather than an "early out" portfolio) with the hope and expectation that the fresh portfolio sale batches would not be infected by the same problems demonstrated in the "early out" portfolios in the previous months.

---

[2] The March 25, 2020 Addendum does not contain a Section 3.5.

85. Absolute purchased the FF3 accounts on the following transfer dates and at the following prices, each governed by the terms of the 2020 Master Agreement as well as an applicable Addendum:

    1.    September 25, 2020 (Purchase Price $1,569,387)

    2.    October 21, 2020 (Purchase Price $1,872,743)

    3.    November 23, 2020 (Purchase Price $1,625,974)

86. To Absolute's dismay, Citi had not been deterred from removing favorable accounts from the sales flow. The FF3 was characterized again by removals that were highly suspect and to detrimental to Absolute. For the FF3 first month's file (September 2020), Citi had removed 387 of the 2,309 accounts previewed during due diligence (16.7%). Of those removed accounts, once again nearly three quarters of them were higher-value accounts, including 17% of the DSC Overlap accounts that had been previewed. As a result, the portfolio ultimately sold to Absolute in September 2020 contained a materially *lower* percentage of higher-value accounts and a materially *higher* percentage of lower-value accounts than what had been previewed in due diligence.

87. Moreover, despite being labeled a "Fresh" account flow—an industry label used to describe accounts that have just become charged off and have not been "worked" by outside collections departments or agencies—the composition of each month's account pool and the unusually poor liquidation of those pools to date suggest otherwise.

88. Finally, for every month of FF3, the accounts sold to Absolute were worse, to a statistically significant degree, than similarly-profiling portfolios sold to Absolute under Dasch's predecessor.

89.     In particular, the average charge-off balance of accounts sold to Absolute, the percentage of DSC Overlap accounts, and the percentage of high-value accounts overall were all lower, to a statistically significant degree, than they had been prior to Dasch's role expanding to include debt sales. Meanwhile, the percentage of accounts qualifying for agency collection work (these are significantly lower-value accounts) were higher after Dasch's promotion, also to a statistically significant degree.

90.     Absolute alerted Citi of these issues by phone in November, and then followed up by email:

> I am writing to follow up on our conversation from last week regarding the November installment of the Costco Fresh – 180 Day Flow. As we discussed, [Absolute] identified a number of irregularities in this month's file, including a material decrease in the number of accounts that qualified for legal and\or are high value, a significant increase in the number of accounts for consumers from California, and a sizeable number of accounts included in the portfolio that had a charge off date more than 60 days prior to Closing, which we clearly do not view as "fresh" accounts. We attempted to put both parties on the same page with a definition of a "fresh" account in the addendum for this flow, but Citibank rejected our proposal that would have addressed this exact situation. There also remains an open question about how the tranche of older accounts are so heavily concentrated in CA, OR, and LA. Were these previously FEMA accounts?
>
> All of these irregularities taken together resulted in a reduction of the value of the portfolio versus the portfolio on which we based our bid to enter into the flow and the prior two monthly installments of the flow. As a result of these deviations, we requested a small price reduction to compensate us for the diminished value of the portfolio. Our request was denied by you on the basis that there was not enough time to entertain a price reduction given the number of internal Citibank mechanisms involved in such a request even though there was a material number of days left in the November business month. So, in good faith and to show the value that we place in our relationship with Citibank, we funded the full amount of the purchase of the portfolio as requested by Citibank.

91.     The parties had several calls to discuss these matters during this time period, during which Absolute repeatedly requested information from Citi concerning the removal of accounts from the monthly sale files and repeatedly requested that the statement in the Seller Surveys that the removed accounts "are randomly selected from the sale eligible pool" be included as a formal representation under the Master Services Agreement or applicable Addenda. Absolute also demanded that Citi explain its use of the term "fresh," given the apparent mislabeling that had occurred with respect to FF3.

92.     Citi refused to provide the information requested by Absolute and further refused to incorporate its Seller Survey statements into its agreements with Absolute.

**Citi Terminates Absolute For Asserting Its Rights**

93.     In light of Citi's continued manipulation of the sale portfolios, and its refusals to provide the information Absolute repeatedly had requested, in December 2020 Absolute advised Citi via email that it would pause its funding of additional monthly flows until it could satisfy itself as to the *bona fides* of Citi's sales and selection process. In a December 30, 2020 email, Absolute conveyed (*inter alia*):

> . . . If we are paying [ ] and not receiving ALL FRESH charged off accounts (+/- 5%) from the month prior to purchase, then what you are representing isn't a FRESH portfolio. . . . A typical FRESH file should contain 95%+ in accounts that charged off late in the month prior to purchase but yet the FRESH files we are purchasing ONLY contain 55% of charged off accounts from the month prior. . . .

> . . . Furthermore, in this current forward flow, CA is averaging between 35-40% in [face value] in each portfolio which happens to be one state that produces low legal and collection liquidation rates, about ¼ of what an A state liquidates at. . . .

> . . . [Absolute] is going to take you up on your previous offer that allows us to back out of any [forward flow] without 60 days written notice in the contract without any harm to our approved buyer status . . . if we felt the files were materially adverse and[/]or misrepresented in which in this case both infractions have occurred. . . .

94.     On January 15, 2021, in the midst of ongoing discussions between the parties and their respective counsel about these matters, Citi abruptly issued a termination letter to Absolute, accusing Absolute of being in default under the 2020 Master Agreement due to Absolute's suspension of funding; purporting to terminate the 2020 Master Agreement; and revoking Absolute's status as an approved debt buyer. That was exactly the outcome Absolute had sought to avoid for nearly a year, notifying Citi of its breaches and continuing in good faith to comply with its bids and to purchase the sales flows at the agreed-upon prices. Citi, on the other hand, blatantly defied its covenant not to employ "materially adverse" selection criteria, and then retaliated (and further harmed) Absolute for finally asserting its rights.

**The Selection and Removal of Accounts Sold to Absolute Was Not Random**

95.     A statistical analysis comparing the accounts sold to Absolute under FF1, FF2 and FF3 as compared to the due diligence files for each flow, demonstrates that the variances were statistically significant and could not have been random.

96.     As explained above, for FF1, FF2, and FF3, a materially higher percentage of removed accounts were classifiable as DSC Overlap, as compared to the accounts eventually delivered to Absolute. For FF2 and FF3, this difference was statistically significant, meaning the removal of these higher-value accounts could not statistically be explained by a random selection process. Instead, the selection and removal of DSC Overlap accounts was systematically detrimental to Absolute and appears to have been intentional rather than random.

97.     In addition, for FF1, FF2, and FF3, the removed accounts had higher overall balances and contained a higher percentage of accounts with balances greater than $10,000 (and were thus more attractive accounts), as compared to the accounts ultimately delivered to Absolute. Once again, for both FF2 and FF3, these differences were statistically significant, meaning this

disproportionate removal of these higher-balance accounts could not statistically be explained by a random selection process. Instead, the selection and removal of accounts was systematically detrimental to Absolute and appears to have been intentional rather than random.

**Citi's Well-Documented Compliance Failures**

98.     Citi's troubling history of with internal control issues and lax compliance environment is not unique to Absolute and has in fact been well-documented.

99.     For instance, in October 2020 the Office of the Comptroller of Currency ("OCC") fined Citi $400 million and issued a consented-to Cease & Desist Order ("C&D Order") upon finding that "[f]or several years, [Citi] has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with [Citi's] size, complexity, and risk profile."[3]

100.     In particular, OCC made findings as to the "failure of [Citi's] enterprise-wide risk management policies, standards, and frameworks to adequately identify, measure, monitor, and control risks" and the "failure of compensation and performance management programs to incentivize effective risk management." The OCC's findings also "identified unsafe or unsound practices with respect to [Citi's] internal controls, including, among other things, an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations."[4]

101.     As a result of the C&D Order, Citi was directed to implement "broad and comprehensive corrective actions" to improve its risk management, data governance, and internal controls.[5]

---

[3] *See* https://www.occ.gov/static/enforcement-actions/ea2020-056.pdf.

[4] *See id.*

[5] *See* https://www.occ.gov/news-issuances/news-releases/2020/nr-occ-2020-132.html.

102. Upon information and belief, Citi has terminated Dasch since this litigation was filed, even while continuing to assert to Absolute that there was no misconduct on Dasch's watch.

**Absolute's Significant Damages**

103. Because of its proprietary recovery methodology and procedures, Absolute is able to predict, within a range of reasonableness, the expected performance of a portfolio it purchases, and it uses that projection to make its purchasing decisions. Absolute usually realizes a multiple of its purchase price for the consumer debt accounts it acquires.

104. Here, however, as a result of Citi's material degradation of the files in question prior to transferring them, Absolute instead expects to lose money on the culled batches of accounts it purchased from Citi.

105. Specifically, based on current estimates, Absolute expects to not recover its cost basis and to lose somewhere between 10-25% of its investment, rather than achieving a high multiple rate-of-return. These losses are solely attributable to the degraded quality of the accounts Absolute purchased from Citi.

106. In addition, Absolute's financial arrangement with its lenders is dependent, in part, upon its realization rate. This is standard and known in the industry. As a result of purchasing accounts from Citi that were worse than what was promised, Absolute's loan and interest expenses will be significantly higher than they would otherwise have been due to lower cash velocities and higher collection costs. Absolute also lost out on other investment opportunities and suffered reputational harm as a result of its improper removal from Citi's qualified debt seller list.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

107. Absolute repeats and realleges all of the foregoing paragraphs as though fully set forth herein.

108.     Absolute and Citi are parties to binding and written agreements, including the Master Agreements and the Addenda to the Master Agreements.

109.     Absolute has performed all of its obligations under the Master Agreements and related Addenda by purchasing debt portfolios from Citi at the times and at the prices agreed upon by the parties.

110.     Citi, on the other hand, has materially breached its contractual obligations to Absolute. Specifically, Citi has violated the covenant in Section 3.5 of the 2020 Master Agreement by repeatedly employing selection criteria "materially adverse" to Absolute.

111.     Section 3.5 of the 2020 Master Agreement is not subject to the limited remedies and/or the notice provision set forth in Section 3.4, because Section 3.5 is a forward-looking covenant; not a representation covered by Section 3.4. Citi did not make any "representations or warranties, express or implied, with respect to any of the Accounts **other than as specifically set forth in [ ] Section 3.3**" (emphasis added).

112.     Moreover, even if Section 3.5 *were* subject to the notice provision in Section 3.4, that provision is void under South Dakota law because it purports to shorten the applicable statute of limitations. In South Dakota, "[e]very provision in a contract restricting a party from enforcing his rights under it by usual legal proceedings in ordinary tribunals, or limiting his time to do so, is void." SDCL § 53–9–6 (arbitration agreements and surety contracts are elsewhere carved out). South Dakota, unlike many other states, does not recognize a distinction between notice provisions and waiver provisions and finds each void if it in practice prevents a party from seeking to enforce its rights within the applicable statute of limitations. *Midcontinent Communications v MCI Communications Services, Inc.*, 4:16-CV-04070-KES, 2018 WL 1370257, at *6 [DSD Mar. 16, 2018] (rejecting the argument that 180-notice written provision was merely a condition precedent

and finding it void under South Dakota law). South Dakota's legal code further provides that "[e]very contract in which amount of damage or compensation for breach of an obligation is determined in anticipation thereof is void." SDCL § 53-9-5.

113.    Finally, even if the notice provision was not void, Absolute provided timely and sufficient notice under Section 3.4(a), which specifically permits notice to be provided in electronic format (*i.e.*, emails).

114.    The Bank has been damaged by the foregoing breaches in an amount to be proven at trial, including punitive damages under South Dakota law because the breaches arise from a continued pattern of deceit.

**SECOND CAUSE OF ACTION**
**<u>Breach of the Covenant of Good Faith and Fair Dealing</u>**

115.    Absolute repeats and realleges all of the foregoing paragraphs as though fully set forth herein.

116.    Absolute and Citi are parties to binding and written agreements, including the Master Agreements and the Addenda to the Master Agreements.

117.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement, which means that neither party will commit any act that has the effect of destroying or injuring the right of the other party to receive the benefits of the contract.

118.    Absolute assesses and bids on due diligence files using proprietary analytics that reliably indicate how much Absolute can expect to recover on a purchased portfolio (*i.e.*, the benefits of Absolute's bargain) absent outside interference. In this case, Absolute deployed those same proprietary analytics on the due diligence files provided by Citi and therefore was able to determine how much it would recover if the portfolios it received from Citi shared the same material characteristics as the due diligence files.

119.    While Citi had some discretion to remove accounts from certain states because of COVID-19, Citi did not have the right to do so in an arbitrary and non-random way.

120.    For example, Citi removed New Mexico from the sale file for December 2020 but did not remove South Dakota or Minnesota despite higher COVID-19 numbers in those states at that same time.

121.    Citi used COVID-19 as a pretext to remove pockets of more profitable loans from the portfolio. And inasmuch as Citi was allowed to delist states, it was not allowed to do so in a manner to deprive Absolute of the benefit of its bargain.

122.    Further, inasmuch as Citi had the discretion to suspend the sale of portfolios it did not have the discretion to do so in an arbitrary and non-random way or in a manner to penalize Absolute. Absolute expected the promised forward flows monthly. By suspending the sales to Absolute but not to others, Citi breached the implied covenant of good faith and fair dealing.

123.    Finally, Citi had an implied duty of good faith to provide information concerning discrepancies in the portfolios upon reasonable request. Citi repeatedly breached this duty by refusing to provide information concerning why accounts were removed, despite Absolute's repeated inquiries.

124.    Citi's conduct has deprived Absolute the benefit of its bargain, injuring Absolute in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Absolute Resolutions Investments, LLC requests that this Court grant the following relief:

A) Judgment against Defendants on Counts I and II herein, awarding Plaintiff damages in an amount to be proven at trial, plus interest accrued and continuing to accrue thereon;

B) Judgment against Defendants ordering disgorgement of their ill-gotten gains in an

amount to be determined at trial, including any compensation or payment received by Defendants from Plaintiffs, plus interest accrued and continuing to accrue thereon;

C) Punitive damages in a sum to be determined at trial;

D) Pre- and post-judgment interest, fees, and costs; and

E) Such other and further relief as the Court may deem just and proper.

Dated:    February 2, 2023              HARRIS ST. LAURENT & WECHSLER LLP
           New York, New York

By: */s/ Yonaton Aronoff*
    Jonathan Harris
    Yonaton Aronoff
    Alisha L. McCarthy
    40 Wall Street, 53rd Floor
    New York, NY 10005
    Tel: 212.397.3370
    jon@hs-law.com
    yaronoff@hs-law.com
    amccarthy@hs-law.com

    *Attorneys for Plaintiff*