UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _1/29/2024_

ABSOLUTE RESOLUTIONS INVESTMENTS, LLC,

                         Plaintiff,

              - against -

CITIBANK, N.A.

                         Defendant.

22 Civ. 2079 (VM)

DECISION AND ORDER

VICTOR MARRERO, United States District Judge.

Defendant Citibank, N.A. ("Citibank") moves pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") to dismiss the Amended Complaint (see Dkt. No. 27 [hereinafter "Amended Complaint" or "AC"]) brought by plaintiff Absolute Resolutions Investments, LLC ("Absolute"). For the reasons stated below, Citibank's motion is **DENIED**.

## I.    BACKGROUND[1]

### A.   ABSOLUTE'S INITIAL COMPLAINT

Absolute initiated this action against Citibank in the Supreme Court of the State of New York, New York County. (See Dkt. No. 1-1 [hereinafter "Initial Complaint"].) In its Initial Complaint, Absolute brought four causes of action: (1) fraud; (2) negligent misrepresentation; (3) breach of

---

[1] Except as otherwise noted, the following background derives from the Amended Complaint. The Court takes all facts alleged therein as true and construes all justifiable inferences arising therefrom in the light most favorable to the plaintiff, as required under the standard set forth in Section II below.

contract; and (4) breach of the covenant of good faith and fair dealing, all in connection with Citibank's sale of delinquent credit card debt to Absolute. (See Initial Complaint ¶¶ 94-128.) Citibank timely removed the action to federal court on the basis of this Court's diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (See Dkt. No. 1.)

After reviewing letters that the parties had exchanged pursuant to this Court's Individual Practices concerning purported deficiencies in the Initial Complaint (see Dkt. Nos. 8-1, 8-2), as well as abbreviated briefing (see Dkt. Nos. 14, 18, 20), this Court issued a Decision and Order on Citibank's motion to dismiss the Initial Complaint. (See Dkt. No. 24 [hereinafter "Prior Decision"].)[2] The Court granted Citibank's motion in its entirety, dismissing all four claims in the Initial Complaint without prejudice to Absolute's filing an amended complaint. (See id. at 29-30.)

B.   ABSOLUTE'S AMENDED COMPLAINT

Following the Prior Decision, Absolute timely filed the Amended Complaint, which is the subject of the instant motion to dismiss. The Amended Complaint contains no cause of action for fraud or negligent misrepresentation but repleads the

---

[2] The Prior Decision is reported at Absolute Resolutions Investments, LLC v. Citibank N.A., 22 Civ. 2079, 2022 WL 17992199 (S.D.N.Y. Dec. 29, 2022).

causes of action against Citibank for breach of contract and breach of the covenant of good faith and fair dealing. The Court now describes the allegations supporting those claims.[3]

1. <u>Citibank's Sale of Delinquent Credit Card Accounts</u>

Citibank sells credit card products and services to the consuming public. (<u>See</u> AC ¶ 17.) When Citibank determines that a credit card account is delinquent and unlikely to be paid by the debtor, Citibank may designate the account as "charged off" and offer it for sale to an outside buyer. (<u>See</u> AC ¶¶ 18-19.) To recoup the purchase price and generate a profit, the outside buyer then attempts to collect on the delinquent debt. (<u>See</u> AC ¶¶ 16, 19.) The sale of delinquent and charged-off accounts can be conducted either in bulk or in a multi-month flow of accounts (known to Citibank and its outside consumer debt purchasers as a "flow sale"). (<u>See</u> AC ¶ 20, 30.)

In a typical flow sale, thousands of accounts are sold monthly when they become charged off, with each monthly sale governed by the same terms. (<u>See</u> AC ¶¶ 20, 30.) Collectively, the accounts sold over the course of several consecutive

---

[3] Because an amended complaint "supercedes the original, and renders it of no legal effect," it is necessary to evaluate the factual allegations of the Amended Complaint standing alone, even though the factual allegations in the Amended Complaint mirror those in the Initial Complaint in many respects. <u>Dluhos v. Floating & Abandoned Vessel, Known as N.Y.</u>, 162 F.3d 63, 68 (2d Cir. 1998).

months are known as a "forward flow" or "sales flow." (See AC ¶ 30.) A forward flow is, in effect, a commitment by Citibank to sell monthly batches (known in the industry as "portfolios") of credit card accounts to the buyer over an agreed-upon number of months, and a commitment by the buyer that it will accept those accounts. The procedure of selling a forward flow of accounts over a multi-month period relieves Citibank from the burden of initiating an entirely new sale every month when credit card accounts become newly delinquent and can be charged off. (See AC ¶ 30.)

When preparing charged-off credit card accounts for sale, Citibank groups those accounts based on common characteristics, like the type of account and the age of the debt. (See AC ¶ 21.) Citibank then initiates a bidding process among prospective buyers for bundles of accounts with similar characteristics. (See AC ¶¶ 21-22.)

The first stage of the bidding process is a due-diligence period. (See AC ¶ 22.) Citibank provides prospective buyers with a representative "sample portfolio" of accounts. (See AC ¶ 22.) The sample portfolio comes with detailed information about the individual accounts that Citibank will include in the first month of the sales flow. That information includes the debt's important characteristics, including the charge-off date of the account, the date of the debtor's last

4

payment, whether the debtor defaulted on the first payment, and the state where the debtor resides. (See AC ¶ 22, 25.)

Most consumer-specific information is redacted from the sample portfolio. (See AC ¶ 23.) Therefore, to review the sample portfolio, prospective buyers must rely on third-party vendors approved by Citibank, who may access unredacted sample portfolios and can assist prospective buyers with analysis and scoring of the accounts that the sample portfolios contain. (See AC ¶ 24.) Sometimes, Citibank also provides a document called a "Seller Survey" to purchasers, containing aggregate information about the credit card accounts to be included in the sales flow and other general information about the terms of sale. (See AC ¶¶ 26, 53-55.)

The characteristics of the accounts in a given portfolio affect the likelihood that purchasers of the accounts will be able to collect the underlying debts and realize a profit on their purchases. (See AC ¶ 28.) For instance, accounts originating from states with advantageous debt-collection laws, and newly charged-off accounts with no history of collection attempts, are considered particularly valuable. (See AC ¶¶ 28, 64, 84.)

After the due diligence period, Citibank solicits bids from prospective buyers that it has pre-approved. Pre-approved buyers participate in a blind bidding process,

without knowing the identity of competing bidders or the amount of competing bids. (See AC ¶ 29.) Citibank generally awards the forward flow to the highest qualified bidder. (See AC ¶ 29.)

2. Absolute and Its Agreements with Citibank

Absolute and its affiliates have been in the business of acquiring and managing charged-off consumer debt from Citibank and other primary creditors for approximately twenty years. (See AC ¶ 16.) Absolute purchased its first portfolio of charged-off debt from Citibank around 2006 and was a consistent buyer of charged-off debt from Citibank from 2011 through 2015. (See AC ¶ 32.) From 2016 through July 2019, Absolute did not purchase any charged-off credit card accounts from Citibank because Absolute was not approved by Citibank as a debt purchaser during that period. (See AC ¶¶ 33-34.)

In July 2019, Citibank approved Absolute as a debt purchaser. (See AC ¶ 35.) The terms of Citibank's approval are described in a Master Purchase and Sale Agreement giving Absolute the right to bid for and purchase forward flows of delinquent Citibank credit card accounts. (See AC ¶ 43; see also Ex. 1 to Decl. of Thomas A. Warns, Dkt. No. 39-1

[hereinafter "2019 Master Agreement"].)[4] The 2019 Master Agreement governed Absolute's bids for and purchases of forward flows from Citibank until early March 2020, when Absolute and Citibank entered into a superseding Master Purchase and Sale Agreement. (See Ex. 2 to Decl. of Thomas A. Warns, Dkt. No. 39-2 [hereinafter "2020 Master Agreement," and together with the 2019 Master Agreement, the "Master Agreements"]; see also AC ¶ 43.)[5] The 2019 Master Agreement and the 2020 Master Agreement are identical in all respects relevant to this dispute, with the obvious exception of their effective dates.[6] (See AC ¶ 44.)

Central to the parties' arrangement, the Master Agreements contemplated that Citibank would "sell, assign and transfer to [Absolute]" — and that Absolute would agree "to purchase from [Citibank]" — delinquent credit card accounts following the bidding process described above. (AC ¶ 44.) For each forward flow awarded to Absolute after the bidding process, the Master Agreements contemplated the parties would execute an addendum reflecting the terms unique to that sales

---

[4] The 2019 Master Agreement is incorporated by reference in the Amended Complaint.

[5] The 2020 Master Agreement is incorporated by reference in the Amended Complaint.

[6] Because the Master Agreements are identical even with respect to the numbering of their sections and subsections, the Court will cite generically to the "Master Agreements," except when there is a reason to distinguish between its 2019 and 2020 iterations.

flow — for instance the purchase price, a description of the credit card accounts to be sold, and the number of months that the sales flow would continue. (<u>See</u> AC ¶ 44.)

Article 3 of the Master Agreements set forth Citibank's representations and warranties. (<u>See</u> AC ¶ 45.) Section 3.3.1 and Section 3.3.2 of the Master Agreements made warranties about the nature and the collectability of the credit card accounts to be transferred to Absolute. For instance, Section 3.3.1(i) provided that "information provided by [Citibank] on the due diligence file is substantially similar to the final electronic file provided to [Absolute]." (AC ¶ 47.) Section 3.3.1 also warranted other facts that related to Absolute's ability to ultimately collect the underlying debt, for instance that the accountholder had not initiated a bankruptcy proceeding (§ 3.3.1(e)), that the debtor was alive (§ 3.3.1(f)), and that the account was not in dispute (§ 3.3.1(g)), among many other express warranties. (<u>See</u> Master Agreements §§ 3.3.1-2.) Section 3.3.2 of the Master Agreements provided: "[Citibank] makes no other representations or warranties, express or implied, with respect to any of the Accounts other than as specifically set forth in this Section 3.3."[7] (<u>Id.</u>; <u>see also</u> AC ¶ 47.)

---

[7] Absolute did not call this language of Section 3.3.2 to the Court's attention in its Initial Complaint.

Article 3's subsequent section concerned Absolute's remedies if any of Citibank's representations and warranties turned out to be untrue. (See Master Agreements § 3.4; see also AC § 48.) In particular, Section 3.4(a) provided that Absolute's "sole remedy against [Citibank] . . . for a breach of any of the representations listed in Article 3 shall be to notify [Citibank]" within 180 days, after which Citibank would either cure the breach or repurchase the allegedly breaching account back from Absolute. (Master Agreements § 3.4(a); see AC ¶ 48.)

Section 3.4(a) further required that Absolute's notice to Citibank be "in writing or electronic format" and be accompanied by certain information and documentation described in Section 3.4(b). (See Master Agreements § 3.4(a); AC ¶ 49.) In turn, Section 3.4(b) instructed Absolute to accompany a notice of breach with account-specific information (for instance, an account number and the "putback reason"[8]) and documentation related to the specific reasons why that debtor's account cannot be collected — for instance,

---

[8] Although "putback reason" is not defined in the Master Agreements themselves, Absolute alleges that Section 3.4(a) is a "put-back" provision typical in these types of transactions. (See AC ¶ 48.) Presumably because due diligence is exceedingly difficult when buying thousands of individual credit card accounts at a time, the 180-day "put-back" period is a logical way to "give purchasers like Absolute a window of time to identify defective accounts that should not have been included in the sale and then ask the seller to repurchase those accounts." Id. The Court infers that the "putback reason" therefore refers to the reason why an individual account was defective and should not have been included in the sale.

a copy of the debtor's bankruptcy filings or a death certificate. (See Master Agreements § 3.4(b); AC ¶ 49.) Absolute's failure to avail itself of Section 3.4's notice procedure for any particular account would "terminate and waive any rights [Absolute] may have to any remedy for breach of [the Master Agreements] with respect to such Account." (Master Agreements, § 3.4(a).)

Section 3.5, the final section of Article 3, limited the method by which Citibank could select the accounts that comprise each portfolio: "Except as disclosed in the final electronic file, [Citibank] will not employ any selection criteria, materially adverse to the interest of [Absolute], in selecting the Accounts sold to [Absolute] hereunder." (AC ¶ 50.)

Finally, Article 12 set forth miscellaneous terms to govern the parties' agreement. For instance, the parties agreed that South Dakota law would govern the enforcement and interpretation of their contracts (see Master Agreements § 12.1), that notice under the Master Agreements would be deemed sufficient if sent to certain addresses (see id. § 12.3), that the parties intended the written contract to embody the entire agreement between them (see id. § 12.7), and that the headings in the agreements were for reference

only and would not affect the interpretation of the contract (see id. § 12.11; see also AC ¶ 45).[9]

### 3. Absolute's Purchases of Citibank Forward Flows

In October 2019, Absolute participated in the typical bidding process on a four-month sales flow of "Early Out" (or recently-charged-off) accounts. (See AC ¶ 53.) During the due-diligence process, Absolute received a sample portfolio and a Seller Survey. (See AC ¶ 53.) The Seller Survey contained aggregate information about the portfolio of accounts available in the sale, as well as the disclaimer that "up to 10% of the sale eligible accounts will likely be retained by [Citibank] from each month's delivery, but reserve [sic] the right to withhold up to 20%. These accounts are randomly selected from the sale eligible pool." (AC ¶ 55.)

As pleaded in the Amended Complaint, Citibank withheld random accounts from the monthly sales of portfolios as a control process (the "control process") to compare the performance of the accounts it retained against the value it realized from the sale. (See AC ¶ 56.) In this way, Citibank could judge the profitability of selling charged-off debt to third parties like Absolute as compared to alternatives like

---

[9] Absolute did not specifically call to the Court's attention the existence of Section 12.11 in its Initial Complaint.

contracting with debt-collection agencies or initiating litigation. (See AC ¶ 56.)

Absolute calculated its bid for the four-month sales flow beginning October 30, 2019 (the "October 2019 Sales Flow") using the information from the sample portfolio and the Seller Survey. (See AC ¶¶ 53-57.) Citibank ultimately awarded the October 2019 Sales Flow to Absolute, and the parties executed an addendum (the "October 2019 Addendum") to the 2019 Master Agreement memorializing the intended sales flow. (See AC ¶¶ 58-59.) The October 2019 Addendum provided that "[e]ach data file delivered by [Citibank] to [Absolute] during the term of this Agreement shall be substantially similar to the data file on which [Absolute] based its bid in all material scoring characteristics." (See AC ¶ 60.)

The standard language for these addenda provided that the "Addendum and the Master Agreement set forth the entire understanding of the Parties . . . and supersedes to the extent indicated all prior agreements, letters, covenants, arrangements, communications, representations, whether oral or written by any representative of either party." (See Master Agreements at Ex. 1.) By implication, the parties did not agree that the earlier-communicated Seller Survey was part of the formal contract between them. (See AC ¶ 91.)

12

The October 2019 Sales Flow proceeded. For each of the four consecutive months beginning October 2019, Citibank sold a portfolio of thousands of charged-off credit card accounts to Absolute. (See AC ¶ 62.) However, starting with the first portfolio sold to Absolute in the October 2019 Sales Flow, Absolute discovered discrepancies between what it expected and what it received from Citibank under the terms of the parties' agreements. Namely, the portfolio Absolute received had a materially lower share of high-value accounts than the due-diligence sample, judged by the characteristics provided in the due-diligence portfolio and the Seller Survey. (See AC ¶¶ 63-66.)

Absolute had identified 53% of the accounts in the sample portfolio as high-value accounts based on the characteristics disclosed. (See AC ¶ 64.) Of the 649 accounts held back as part of Citibank's control process, a higher share — 414, or 64% — were high-value accounts, leaving the actual portfolio with a materially lower value in the aggregate than Absolute had expected based on the sample. (See AC ¶ 65.) According to the statistical analysis described in the Amended Complaint, if the held-back accounts had been truly selected at random, one would expect between 321 and 366 of them to be high value — a range far lower than the 414 high-value accounts actually held back. (See AC ¶ 66.) In the three subsequent months of

the October 2019 Sales Flow, Citibank continued to deliver account portfolios with materially lower proportions of high-value accounts as compared against the sample portfolio. (<u>See</u> AC ¶ 67.)

The four-month October 2019 Sales Flow concluded in January 2020. Thereafter, Absolute had the opportunity to engage in the bidding process for a new sales flow from Citibank. (<u>See</u> AC ¶¶ 70-71.) Again, Absolute conducted due diligence on a sample portfolio and ultimately Absolute bid for and secured a sales flow for the three consecutive months beginning March 2020 (the "March 2020 Sales Flow"). (<u>See</u> AC ¶ 71.) Consistent with the applicable 2020 Master Agreement, the parties executed an addendum to formalize the March 2020 Sales Flow (the "March 2020 Addendum"). (<u>See</u> AC ¶ 71.)

Just as was the case regarding the prior sales flow, Absolute noticed material discrepancies in the first month of the March 2020 Sales Flow between the percentage of high-value accounts it expected and what it received from Citibank under the terms of the parties' agreements. Again, because of Citibank's holdbacks, the final portfolio delivered to Absolute had a materially lower share of high-value accounts than the sample portfolio. (<u>See</u> AC ¶ 71.) Absolute wrote an email to Citibank, attaching a list of accounts that "were removed in a disproportionate rate to [] high scoring

accounts" and noting that Citibank's holdbacks contained higher-value accounts at "twice the rate" of lower-value accounts. (See AC ¶ 75.) As alleged in the Amended Complaint, Citibank did not provide a written response. (See AC ¶ 76.)

In April, the second month of the March 2020 Sales Flow, Citibank provided initial data on the portfolio of accounts that it intended to sell to Absolute pursuant to the March 2020 Addendum. (See AC ¶ 78.) Absolute again noticed severe discrepancies and wrote an email to Citibank identifying those discrepancies and demanding an explanation. (See AC ¶ 79.) Citibank proposed a call to discuss the issues. (See AC ¶ 80.) Absolute alleges that Citibank used the call to inform Absolute that all sales flows would be suspended because of the COVID-19 pandemic, and therefore Absolute would not receive any accounts from Citibank in April 2020. (See AC ¶¶ 78, 80.) Absolute further alleges that other approved debt purchasers reported no interruptions in portfolio sales from Citibank in April 2020. (See AC ¶ 78.)

In May 2020, when the next portfolio of accounts was due to be sold under the three-month March 2020 Sales Flow, Citibank approached Absolute to negotiate a release of claims. (See AC ¶ 82; see also Ex. 3 to Decl. of Thomas A.

Warns, Dkt. No. 39-3 [hereinafter the "Release"].)[10] Absolute
signed the Release under the impression that, without the
Release, Citibank would end the relationship between the
parties and Absolute would not be able to bid on charged-off
Citibank credit card debt going forward. (See AC ¶ 82.)
Accordingly, Absolute agreed to release and discharge
Citibank from "all damages, costs, and liabilities relating
to claims that (a) [Citibank] violated Section 3.5 of the
Addendum by using selection criteria adverse to [Absolute],
and (b) [Citibank] breached the Addendum and/or the Agreement
by suspending the sale of Accounts in April 2020." (Release,
Clause 6; AC ¶ 82.) After Absolute signed the Release, the
May 2020 portfolio sale closed, concluding the March 2020
Sales Flow. (See AC ¶¶ 71, 81.)

In the summer of 2020, Absolute bid on another forward
flow of accounts, this time a three-month forward flow to
occur in the three consecutive months beginning September
2020 (the "September 2020 Sales Flow"). (See AC ¶¶ 84-85.)
Citibank awarded the September 2020 Sales Flow to Absolute.
As occurred with regard to the two earlier forward flows,
Absolute and Citibank executed an addendum memorializing the
parties' agreement. (See AC ¶ 85.) However, the September

---

[10] The Release is incorporated by reference in the Amended Complaint.

2020 Sales Flow differed from the earlier sales flows in that it was to consist of a higher quality flow of account portfolios compared to the earlier sales flows that Absolute purchased.[11]

As occurred with regard to the prior forward flows, Absolute noticed material discrepancies in the first month of the September 2020 Sales Flow between the percentage of high-value accounts it received and what it expected from Citibank under the terms of the parties' agreements. Absolute alleges that Citibank's control process once again caused the portfolio delivered to Absolute to contain a materially lower share of high-value accounts than the sample portfolio. (See AC ¶ 86.)

Absolute alerted Citibank to these discrepancies over a phone call and memorialized that discussion by email. (See AC ¶ 90.) During ensuing phone conversations, Absolute made several demands, including demands for information concerning Citibank's practices with respect to the control process that resulted in holding back high-value accounts, demands for

---

[11] Absolute's Amended Complaint alleges that Citibank marketed the October 2019 Sales Flow and the March 2020 Sales Flow as "Early-Out" portfolios, meaning that the individual accounts comprising those portfolios were recently charged off and had been recalled from collection agencies while Citibank still owned the accounts. (See AC ¶ 21.) By comparison, the September 2020 Sales Flow was a flow of "Fresh" accounts, meaning that those portfolios consisted of accounts that had been charged off in the previous month and collection had never been attempted by a collection agency. (See AC ¶ 87.)

information regarding Citibank's labelling of the account portfolios,[12] and demands that Citibank agree to formally integrate certain statements from the Seller Surveys into the parties' agreements. (See AC ¶ 91.) In particular, Absolute wanted the statement from the Seller Surveys that Citibank's holdbacks would be "randomly selected from the sale eligible pool" to be a formal contractual commitment. (See AC ¶ 91.) Citibank refused those demands. (See AC ¶ 92.)

In December 2020, Absolute informed Citibank that Absolute intended to suspend payment for future sales until it could satisfy itself as to the *bona fides* of Citibank's sales and selection process with respect to the accounts offered in the forward flows. (See AC ¶ 93.) Absolute made good on its intention, and the following month, Citibank terminated the 2020 Master Agreement because of Absolute's suspension of payment. (See AC ¶ 94.) This action revoked Absolute's status as an approved buyer of charged-off Citibank credit card debt and effectively ended the commercial relationship between the parties. (See AC ¶ 94.) Absolute then brought this lawsuit.

---

[12] That is, Absolute sought to learn how Citibank decided to label a portfolio as "Fresh" versus "Early-Out."

C.   <u>PROCEDURAL HISTORY OF THE INSTANT MOTION</u>

Consistent with this Court's Individual Practices, the parties exchanged letters identifying purported deficiencies in the Amended Complaint and responding thereto. (<u>See</u> Dkt. Nos. 34-1, 34-2.) Having not resolved their dispute concerning the sufficiency of the Amended Complaint, Citibank requested a conference with the Court in search of preliminary guidance or rulings. (<u>See</u> Dkt. No. 34.) The Court found that a conference would not be necessary and directed the parties to advise whether they would consent to the Court's ruling on the basis of the pre-motion letter exchange, or whether the parties would request supplemental or full briefing. (<u>See</u> Dkt. No. 35.) The parties requested full briefing, and the Court granted Citibank leave to file a motion to dismiss with full briefing. (<u>See</u> Dkt. Nos. 36, 37.)

Citibank thereafter filed its motion (<u>see</u> Dkt. No. 38) accompanied by a memorandum of law in support of that motion (<u>see</u> Dkt. No. 40 [hereinafter "Motion" or "Mot."].) Absolute filed a memorandum of law in opposition to the Motion. (<u>See</u> Dkt. No. 41 [hereinafter "Opposition" or "Opp."].) Citibank then filed a memorandum of law replying to Absolute's Opposition. (<u>See</u> Dkt. No. 42 [hereinafter "Reply"].)

## II.   LEGAL STANDARD

Citibank moved to dismiss the Amended Complaint under Rule 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Put differently, a complaint should not be dismissed when the plaintiff's allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.

A Rule 12(b)(6) motion challenges only the legal feasibility of the complaint, and courts adjudicating such motions "take[] no account of the complaint's 'basis in evidence.'" Nunes v. NBCUniversal Media, LLC, 643 F. Supp. 3d 403, 411 (S.D.N.Y. 2022) (quoting Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016)). "Generally, courts do not look beyond facts stated on the face of the complaint, documents incorporated in the complaint, matters of which judicial

notice may be taken and documents that are 'integral' to the complaint." Id. (quoting Goel, 820 F.3d at 559). At the same time, the Rule 12(b)(6) standard instructs the Court to construe the complaint "liberally." In re Inclusive Access Course Materials Antitrust Litig., 544 F. Supp. 3d 420, 431 (S.D.N.Y. 2021) (quoting Coal. for Competitive Elec. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018)).

### III. **DISCUSSION**

A.   BREACH OF CONTRACT

Absolute's first claim alleges breach of contract. To state a claim for breach of contract under South Dakota Law,[13] a plaintiff must allege the existence of "[1] An enforceable promise; [2] A breach of the promise; and [3] Resulting damages." Guthmiller v. Deloitte & Touche, LLP, 699 N.W.2d 493, 498 (S.D. 2005). Absolute contends that, during the control process, Citibank "cherry-picked high-value accounts" (Opp. at 1) out of the sales portfolios before transferring those portfolios to Absolute, in violation of Citibank's promise to "not employ any selection criteria, materially adverse to the interest of [Absolute], in selecting the Accounts sold to [Absolute]" (Master Agreements § 3.5; see also Opp. at 2). Absolute also alleges that Citibank

---

[13] Neither party disputes the application of South Dakota law to this dispute pursuant to Section 12.1 of the Master Agreements.

represented, at least with respect to the October 2019 Addendum, that the portfolios actually delivered to Absolute would be "substantially similar" to the sample portfolio "in all material scoring characteristics." (See AC ¶ 60.)

In its motion to dismiss, Citibank contends that two contractual provisions bar Absolute's claim. First, Citibank argues that Absolute failed to provide notice of Citibank's alleged breaches of the Master Agreements. (Mot. at 3-5.) According to Citibank, the notice-and-cure procedure embodied in Section 3.4 is Absolute's "sole remedy," and Absolute's failure to provide notice of its claim operates to "terminate and waive any rights [Absolute] may have to any remedy for breach" of the Master Agreements. (Mot. at 3-4.) Next, Citibank argues that the Release expressly discharges all claims under the Master Agreements prior to May 2020. (See Mot. at 9-10.)

Notwithstanding the outcome of the Prior Decision in this matter, the Court finds that Absolute's failure to provide notice pursuant to the procedures of Section 3.4 of the Master Agreements does not bar Absolute's claim. The Court further finds that the Release, while enforceable, is

ambiguous as to its scope. Accordingly, the Court will sustain Absolute's claim for breach of contract.

    1.   <u>Pre-Suit Notice</u>

    Upon close examination of the Master Agreements, as pleaded in the Amended Complaint, the Court is persuaded that Absolute did not have a duty to notify Citibank under the procedures set forth in Section 3.4 for an alleged breach of Section 3.5. The disagreement over the applicability of Section 3.4 is one of contract interpretation. (<u>See</u> Opp. at 3; Reply at 2.)

    The Court may decide a matter of contract interpretation on the instant motion to dismiss because, in South Dakota, "contract interpretation is a question of law." <u>Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co.</u>, 822 N.W.2d 724, 726 (S.D. 2012). Where parties disagree on what a contract means, the "answer must come from the contract." <u>Yarcheski v. Reiner</u>, 669 N.W.2d 487, 495 (S.D. 2003). That is, the Court "looks to the language that the parties used in the contract to determine their intention." <u>McKie Ford Lincoln, Inc. v. Hanna</u>, 907 N.W.2d 795, 798 (S.D. 2018). "It is a fundamental rule of contract interpretation that the entire contract and all its provisions must be given meaning if that can be accomplished consistently and reasonably." <u>Prunty Const., Inc. v. City of Canisosta</u>, 682 N.W.2d 749, 756 (S.D. 2007).

Nested within Article 3 of the Master Agreements, Section 3.4 provides that "[Absolute's] sole remedy against [Citibank] . . . for a breach of any of the representations listed in Article 3 shall be to notify [Citibank] of the breach" pursuant to the notice procedure laid out in Section 3.4. Also nested within Article 3, Section 3.5 is the provision of the Master Agreements that Absolute alleges Citibank has breached. On the one hand, Citibank contends that Section 3.5 is one of "the representations listed in Article 3," which therefore limits Absolute's remedies to the notice-and-cure procedure.[14] (See Mot. at 3-4.) On the other hand, Absolute argues that Section 3.5 is not a representation of fact listed in Article 3 but rather is a covenant for future performance. (See Opp. at 2.)

The text of a different provision of Article 3 expressly supports Absolute's position. After warranting various facts in Sections 3.3.1 and 3.3.2 about the nature and collectability of the credit card accounts that Citibank intended to sell, Section 3.3.2 concludes with the following disclaimer: "[Citibank] makes no other representations or warranties, express or implied, with respect to any of the

---

[14] Though Absolute believes that it "reasonably complied" with the notice procedure, it does not argue that it complied with every requirement of Section 3.4, particularly the portions of Section 3.4(b) that would require Absolute to provide certain documentation to Citibank for notice to be effective. (Opp. at 5-6.)

Accounts *other than as specifically set forth in this Section 3.3.*" (<u>See</u> AC ¶ 47 (emphasis added); Opp. at 3-4.) The duty imposed by Section 3.5 is, to state the obvious, not set forth in 3.3. Therefore, Section 3.5 is not a representation or warranty according to the contract itself.

Citibank argues that, because Section 3.4 expressly applies to "any of the representations listed in Article 3," that a breach of any subsection of Article 3 must be formally noticed. To argue that every subsection of Article 3 is a "representation[] listed in Article 3," Citibank takes the view that "Article 3 does not distinguish between representations, warranties, or covenants." (Mot. at 5-6.) Yet this interpretation does not account for why Section 3.3.2 would state that some — but not all — subsections in Article 3 contain representations and warranties.

The waiver of litigation rights in Section 3.4 further contains specific language that mirrors the language of Section 3.3.2, suggesting that those two provisions are closely related and ought to be interpreted together. (<u>See</u> Opp. at 3-4.) Section 3.3.2 dictates that all of the representations and warranties with respect to the subject credit card accounts are found in Section 3.3. Section 3.4 then directs Absolute to provide formal notice to Citibank. Absolute's failure to provide notice operates to "terminate

and waive any rights [Absolute] may have to any remedy for
breach of [the Master] Agreement *with respect to such Account*"
(emphasis added). Together, these provisions clarify that the
Section 3.4 notice-and-cure procedure relates to the breach
of any representations or warranties about individual
accounts purchased by Absolute — for instance, whether an
account is subject to a stay of collection pursuant to
bankruptcy proceedings or whether collection against a debtor
would be impossible because the debtor has died.[15]

Moreover, Citibank's interpretation of Section 3.4 would
not give full effect to every word of Section 3.4 itself.
Section 3.4(a) states that failure to provide Citibank with
notice "as provided in this Section 3.4 shall terminate and
waive any rights Buyer may have to any remedy for breach of
this Agreement *with respect to such Account*" (emphasis
added). Citibank urges the Court to ignore that limiting
language and instead apply the blanket statement in the first
sentence of Section 3.4, which provides that notice-and-cure
is the "sole remedy" for breach of "*any* of the representations
listed in Article 3" (emphasis added). The Court cannot at

---

[15] Absolute also notes that its interpretation of the notice-and-cure
procedure is consistent with Section 3.4 being an industry-standard
"putback" clause. (<u>See</u> AC ¶ 48.) If Absolute's description of industry
practice is true, as the Court must assume it is, this provides yet
another reason why Absolute's interpretation is correct. However, the
Court need not look beyond the four corners of the instrument to reach
its conclusion about the proper interpretation of the Master Agreements.

the same time give full effect to the sweeping language of the first sentence and the limiting language of the fourth sentence. In such cases, "the more specific clauses are deemed to reflect the parties' intentions" and therefore "a specific provision controls a general one." Prunty Const. Inc., 682 N.W.2d at 756 (quoting Carstensen Contracting, Inc. v. Mid-Dakota Rural Water Sys., Inc., 653 N.W.2d 875, 877 (S.D. 2002)). Accordingly, the Court declines to enforce a blanket application of the notice requirement of Section 3.4 across all subsections of Article 3.

In sum, Section 3.3.2 clarifies that Section 3.5 of the Master Agreement is not a representation or warranty, and therefore it is not subject to the strict notice requirements set forth in Section 3.4. Citibank's interpretation would nullify key words found in Sections 3.3.2 and 3.4(a). Accordingly, pursuant to Section 3.3.2, the Court finds that the notice-and-cure procedure of Section 3.4 applies only to the representations and warranties of Section 3.3, which are the representations and warranties relating to specific accounts. Absolute's remedies for Citibank's alleged breach of Section 3.5 are not limited by Section 3.4.

Aside from its arguments with respect to the interpretation of the Master Agreements, Citibank also contends that it is procedurally improper to disturb this

27

Court's Prior Decision, which interpreted the contract in favor of Citibank. (See Mot. at 5-6.) Citibank argues that the Prior Decision is binding as the law of the case. (See Reply at 2.) Not so. It is procedurally proper — and, in this case, entirely warranted — to rule that the Amended Complaint states a claim for breach of contract, even though the Initial Complaint did not.

Under the law-of-the-case doctrine, "a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation." Weslowski v. Zugibe, 96 F. Supp. 3d 308, 316-17 (S.D.N.Y. 2015); accord Temple v. Roberts, Civ. 15-5062, 2018 WL 4120036, at *3-4 (D.S.D. Aug. 29, 2018) (similar). Yet it is well-settled that this doctrine is not absolute; rather, the Court should "generally" follow "prior decisions in subsequent stages of the same case unless cogent and compelling reasons militate otherwise." Choi v. Tower Research Cap. LLC, 2 F.4th 10, 21 (2d Cir. 2021); see also Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 8 (2d Cir. 1996) (describing the law-of-the-case doctrine as "discretionary" such that it "does not limit a court's power to reconsider its own decisions prior to final judgment"). Cogent and compelling reasons may include "an intervening change in law, availability of new evidence, or the need to

correct a clear error or prevent manifest injustice." Choi, 2 F.4th at 21 (quotation marks omitted).

In this case, the Court finds that there are cogent and compelling reasons not to treat the Prior Decision as binding law of the case. Absolute's Amended Complaint brought to the Court's attention relevant contractual provisions that, as discussed below, were not brought to the Court's attention in the Initial Complaint and affect the legal interpretation of the Master Agreements, as explained above. The Amended Complaint specifically pleaded the existence of the last sentence of Section 3.3.2 (stating that no representations or warranties with respect to the accounts could be found outside Section 3.3) and Section 12.11 (forbidding the interpretation of the contracts on the basis of section-headings). Neither the Initial Complaint (see Dkt. No. 1-1), nor the briefing on the motion to dismiss the Initial Complaint (see Dkt. Nos. 14, 18, 20), alerted the Court to the language of those critically important provisions.

These provisions not only provide new information about the parties' bargain for the Court to consider; they also significantly alter the ground for the Court's earlier ruling. The Prior Decision held that Section 3.5 was a representation or a warranty because it could be found within Article 3, titled "REPRESENTATIONS AND WARRANTIES." (See

Prior Decision, at 24-25.) It is now clear that that
interpretation was barred by Section 12.11 of the Master
Agreements. To allow a contractual interpretation that runs
contrary to the contract's express terms would risk imposing
a manifest injustice on the parties who negotiated and agreed
to those terms. Even though the Court is mindful that Section
3.3.2 and Section 12.11 of the Master Agreements do not,
strictly speaking, constitute a change in controlling law or
new evidence, the Court is still satisfied that its fresh
look at the precise language of the Master Agreements is
proper, warranted, and fair. See Pineiro v. Pension Benefit
Guar. Corp., No. 96 Civ. 7392 (LAP), 1999 WL 195131, at *2
(S.D.N.Y. Apr. 7, 1999) (noting that a new legal position in
an amended complaint "prompted a fresh look" at an issue of
statutory interpretation).

The Court also rejects Citibank's apparent view that it
was "procedurally improper" (Mot. at 5) when Absolute
repleaded its complaint to call to the Court's attention
relevant contractual provisions not previously addressed by
the parties. Repleading a complaint with leave of Court, and
then opposing a motion to dismiss the repleaded complaint,
does not "effectively amount[] to a motion for
reconsideration" as Citibank argues. (Reply at 1.)

The Court granted Absolute leave to replead as an opportunity to cure the deficiencies in the Initial Complaint. It is expected and encouraged under Federal Rule of Civil Procedure 15(a)(2) that Absolute might raise matters that it had overlooked before. See Smiga v. Dean Witter Reynolds, Inc., 766 F.2d 698, 703 (2d Cir. 1985) ("The purpose of amending a pleading is to assert matters that were overlooked or were unknown at the time of the original complaint." (cleaned up)); Stanley Works Israel Ltd. v. 500 Grp., Inc., 332 F. Supp. 3d 488, 505 n.3 (D. Conn. 2018) (repleading a complaint in response to arguments made in a motion to dismiss is "not just proper, it is prescribed and promoted by the Federal Rules"); see also Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1473 (3d ed. 2023).

The Amended Complaint adequately states a claim for breach of contract. The notice-and-cure provision does not bar Absolute's claim for breach of Section 3.5 of the Master Agreements, notwithstanding this Court's Prior Decision on the sufficiency of the Initial Complaint. Because Section 3.4 of the Master Agreements does not create an impediment to Absolute's claims, the Court need not consider the parties' arguments on whether Section 3.4 is enforceable under South Dakota law or whether Absolute complied with Section 3.4.

2. <u>Release of Claims</u>

The Court now turns to Citibank's contention that Absolute's claim for breach of contract is limited in large part by the Release signed by the parties in May 2020. (See Mot. at 9-10.) In particular, Citibank believes that Absolute has released all claims relating to breaches of Section 3.5 of the Master Agreements with respect to the October 2019 Sales Flow and the March 2020 Sales Flow.[16] (See id.) Absolute does not deny that it signed the Release, but it claims that the Release should not be enforced because it was "procured under economic distress." (Opp. at 10-11.) Absolute also argues that the terms of the Release do not affect any claims except those that arise out of the first portfolio sale, in March 2020, of the March 2020 Sales Flow. (See Opp. at 11-12.) The Court finds that, although the Release is enforceable over Absolute's objections, the scope of the release is ambiguous.

a. Enforceability of the Release

Absolute resists enforcement of the Release agreement. Particularly, Absolute argues that it entered into the Release under "economic duress" because Citibank "implied that, absent such a release, Absolute would be dropped as an approved debt buyer and prohibited from purchasing debt

---

[16] Citibank does not contend that the Release has any effect on claims relating to the September 2020 Sales Flow.

portfolios from [Citibank] in the future." (Opp. at 10; <u>see also</u> AC ¶ 82.) This implication allegedly left Absolute with "little choice" but to execute the Release. (<u>Id.</u>) Absolute's argument is not persuasive.

Unenforceability on the basis of economic duress would require Absolute to plead that (1) "one side involuntarily accepted the terms of another," (2) "circumstances permit[ted] no other reasonable alternative," and (3) "said circumstances were the result of a coercive wrongful act of the opposite party." <u>Dunes Hospitality, L.L.C. v. Country Kitchen Int'l, Inc.</u>, 623 N.W.2d 484, 490 (S.D. 2001); <u>see Pochat v. State Farm Mut. Auto. Ins. Co.</u>, 772 F. Supp. 2d 1062, 1066 (D.S.D. 2011). Absolute's pleadings do not describe facts that would satisfy any of the elements of economic duress.

First, there are no allegations that Absolute involuntarily signed the release. "The entering into a contract with reluctance or even dissatisfaction with its terms" does not render Absolute's acceptance involuntary. <u>Dunes Hospitality</u>, 623 N.W.2d at 490. Absolute's contention (Opp. at 11) that "no party would willingly give up these claims without adequate compensation" is a circular argument that demonstrates only that Absolute sees the Release as unreasonable in hindsight. (<u>See</u> Reply at 8-9.) Further, the

Amended Complaint describes how Absolute believed that the Release was a "tacit admission" by Citibank akin to an apology, and that Absolute "hoped that, having been 'caught,' Citibank would resolve the issue going forward." (AC ¶ 83.) There is no involuntary acceptance in these circumstances.

Second, Absolute does not explain why there would be no reasonable alternative to signing the Release. Even assuming that the Release was required for Citibank to continue its business with Absolute (see Opp. at 11), Absolute does not explain why Absolute's ending commercial dealings with Citibank would not be a reasonable alternative. As described in the Amended Complaint, Absolute has in its twenty-year history only intermittently done business with Citibank. (See AC ¶¶ 32-34; Opp. at 11.) Even if Citibank is a lucrative partner, there is no suggestion that Absolute could not reasonably and profitably continue its operations in the absence of a commercial relationship with Citibank. Moreover, "access to an available legal resolution" like litigation effectively precludes Absolute's argument in this respect. Pochat, 772 F. Supp. 2d at 1066. There is no reason why Absolute could not bring its claims against Citibank to a court, as it ultimately did through this action, rather than agree to discharge those claims.

Finally, Citibank took no wrongfully coercive action. Under South Dakota law, "[a] claim of economic duress cannot be based upon a claim that one has been the victim of a hard bargain." Dunes Hospitality, 623 N.W.2d at 490. The coercer's actions must amount to "unlawful or unconscionable pressure." Id. at 490. With South Dakota law governing this case, there is no reason why Absolute's citations to contrary jurisprudence from the Alaska Supreme Court would control. (See Opp. at 10 (citing Helstrom v. N. Slope Borough, 797 P.2d 1192 (Alaska 1990).) Citibank's mere implication that it would discontinue its business dealings with Absolute absent a limitation of liability is not plausibly unlawful or unconscionable, especially when Absolute is a sophisticated party experienced in high-value, complex commercial negotiations. (See Reply at 9; AC ¶ 16.)

    b.   Scope of the Release

Having determined that the Release is enforceable, the Court now considers the Release's scope. The parties disagree whether the Release applies to claims arising out of all sales conducted as part of both the October 2019 and the March 2020 Sales Flows, as Citibank urges (see Mot. at 9-10), or only the first portfolio sale of the March 2020 Sales Flow, as Absolute urges (see Opp. at 11-12.) The Court finds that the

Release is ambiguous because it is susceptible to multiple reasonable interpretations.

In relevant part, the Release provides that Absolute discharges Citibank "from all damages, costs, and liabilities relating to claims that . . . [Citibank] violated Section 3.5 of the Addendum by using selection criteria adverse to Buyer." (Release, Clause 6(a).) The Release defines the "Addendum" as the two-page document that memorialized and initiated the March 2020 Sales Flow — more formally identified as Addendum No. 2 dated March 25, 2020. (See Release, Recitation B.) Elsewhere, the Release uses the term "Agreement," defined as the 2020 Master Agreement. (See Release, Recitation A.)

As an initial matter, neither party contends that the Release, by its terms, applies to the 2019 Master Agreement. Where the Release refers to the "Agreement," it expressly refers only to the 2020 Master Agreement. (See Release, Recitation A.) Citibank takes the view that Absolute conceded in this litigation that it released Citibank from liability concerning all sales "prior to May 2020," including the October 2019 Sales Flow. (Mot. at 9; Reply at 7.) Absolute made this concession, Citibank claims, in its opposition to the motion to dismiss the Initial Complaint and the preceding letter exchange. (Mot. at 9; Reply at 7; see also Dkt. No. 8-2; Dkt. No. 18; AC ¶ 7.) Absolute explains that these

statements, though "unclear," were intended only to emphasize that the release affects sales completed prior to (and not subsequent to) May 2020. (Opp. at 12 n.4.) The Court credits Absolute's explanation and will not treat such passing language made in legal briefing as waivers of substantial contractual rights. Accordingly, the question now before the Court is the degree to which the Release limits liability arising from the 2020 Master Agreements and its various addenda.

The parties acknowledge that Clause 6(a) of the Release contains an error because it refers to Section 3.5 of the Addendum, and the Addendum has no such section. (See Opp. at 11-12 & n.5; Reply at 7.) Citibank's position is that the parties clearly intended to release liability with respect to Section 3.5 of the 2020 Master Agreement. (See Reply at 7.) Citibank reasons that no other interpretation could be viable because the Release discharges claims that Citibank "use[d] selection criteria adverse to [Absolute]," and Section 3.5 of the 2020 Master Agreement contains the identical phrase "selection criteria adverse to [Absolute]." (See Reply at 7.)

Absolute argues that inclusion of the word "Addendum," rather than "Agreement," requires the Court to interpret the Release narrowly. (See Opp. at 11-12.) The only portfolio sale that could have arguably violated "Section 3.5 of the

37

Addendum" is the sole portfolio sale that had occurred at that point pursuant to the Addendum: the sale in March 2020. (Id.) Or, stated differently, the Release uses the word "Addendum," so it cannot discharge Citibank's liability from portfolio sales not governed by the Addendum. (See id.)

The question here is again one of contract interpretation, in which the Court must "ascertain and give effect to the intention of the parties." Roseth v. Roseth, 829 N.W.2d 136, 142 (S.D. 2013). In doing so, the Court must rely on the contract language they actually used. See Malcolm v. Malcolm, 365 N.W.2d 863, 865 (S.D. 1985); see also Yarcheski, 669 N.W.2d at 495 ("[T]he answer must come from the contract.").

Here, the ordinary rules of contract interpretation are insufficient to determine the precise intent of the parties because the Release discharges liability from a contractual provision that does not exist. The Court agrees that this was apparently a drafting mistake and that the contract cannot possibly mean what it actually says. Each party has its reasonable theory of what was intended. However, neither theory is supported solely by language within the four corners of the contract. Accordingly, it is not appropriate for the Court to choose one theory over the other on this motion to dismiss.

Instead, the Court finds that the apparent drafting error renders the Release ambiguous. "A contract is ambiguous when application of rules of interpretation leaves a genuine uncertainty as to which of two or more meanings is correct." Dowling Fam. P'ship v. Midland Farms, 865 N.W.2d 854, 860 (S.D. 2015) (brackets omitted). More precisely, the Court may determine that the contract is ambiguous as a matter of law if the "contract is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Ducheneaux v. Miller, 488 N.W.2d 902, 909 (S.D. 1992); see also Roseth, 829 N.W.2d at 142. There are at least two reasonable interpretations of what the parties intended, as already described.

A determination of ambiguity is significant because, once a court finds that a contract is ambiguous, a question of fact emerges. See Gail M. Benson Living Tr. v. Phys. Office Bldg., Inc., 800 N.W.2d 340, 344 (S.D. 2011) (stating that where contract is ambiguous, evidence must be introduced to determine parties' intentions). Absolute therefore must be afforded the opportunity to conduct discovery on the parties' intentions with respect to the disputed scope of the Release.

Accordingly, Citibank's motion to dismiss Absolute's claim for breach of contract is hereby **DENIED**.

39

B.    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

Absolute's second claim is one for breach of the covenant of good faith and fair dealing. In South Dakota, "[e]very contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." Garrett v. BankWest, Inc., 459 N.W.2d 833, 841 (S.D. 1990); see also Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 193 (S.D. 2007). The "implied covenant allows an aggrieved party to sue for breach of contract when the other contracting party, by his lack of good faith, limited or completely prevented the aggrieved party from receiving the benefits of the bargain." Garrett, 459 N.W.2d at 841.

"'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." Farm Credit Servs. of Am. v. Dougan, 704 N.W.2d 24, 28 (S.D. 2005). Under the covenant of good faith and fair dealing, an "implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties" when the contract is silent on a particular issue. Nygaard, 731 N.W.2d at 194. Therefore, the implied covenant

40

of good faith can neither "block use of terms" found in the contract nor "supply implied terms" at odds with the contract. Farm Credit Servs., 704 N.W.2d at 28. In this sense, liability under the implied covenant of good faith and fair dealing cannot exist "when the language of a contract addresses the issue." Nygaard, 731 N.W.2d at 194.

Absolute contends that Citibank breached the implied covenant of good faith in three ways, by (1) removing accounts from the portfolios in a non-random way, (2) penalizing Absolute by terminating the Master Contract when Absolute raised concerns about the composition of the portfolios it received, and (3) failing to provide information concerning discrepancies in the portfolios on Absolute's reasonable request. (See AC ¶¶ 119, 122, 123; Opp. at 12.) Citibank responds that Absolute has waived the covenant of good faith and fair dealing. (See Mot. at 10-12.)

At the outset, the Court finds Citibank's waiver argument to be strange and unpersuasive. Citibank's argument is that a waiver of the implied covenant of good faith can be inferred from the use of the word "implied" in Section 3.3.2 (Citibank "makes no other representation or warranties, express *or implied*, with respect to any of the Accounts" (emphasis added)). (See Mot. at 10.) Citibank believes that this conclusion is further supported by Section 12.7, which

41

states that the Master Agreement and its exhibits "embody the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter." In Citibank's view, the implied covenant of good faith is an extracontractual covenant. (See Mot. at 10-12.)

The provisions Citibank cites are not reasonably understood as a waiver of the covenant of good faith and fair dealing. The Court credits Absolute's view that these provisions are boilerplate integration clauses that today are ubiquitous in all types of written contracts. (See Dkt. No. 34-2 at 3.) Generally speaking, an integration clause is intended to clarify that any understandings between the parties are not binding unless they are memorialized in the text of the final contract itself — in particular, preliminary agreements or oral representations made during contract negotiations. See, e.g., Pankratz v. Hoff, 806 N.W.2d 231, 236 (S.D. 2011) (holding that an integrated contract is a "complete and final expression" of the parties' agreements and that the agreement does not include "prior or contemporaneous negotiations or conversations inconsistent with the writing"); accord Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 154 (2d Cir. 2016) (applying Pennsylvania law) ("An integration clause which states that a writing is meant to

represent the parties' entire agreement is [] a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution."); <u>Volt Elec. NYC Corp. v. A.M.E., Inc.</u>, 586 F. Supp. 3d 262, 281 (applying New York law) ("[A]n integration, or merger, clause, where effective, can require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing."); <u>see</u> <u>also</u> Restatement (Second) of Contracts § 209 cmt. b ("Written contracts, signed by both parties, may include an explicit declaration that there are no other agreements between the parties.")

Sections 3.3.2 and 12.7 constitute simply an agreement to rely on the words of the Master Agreements rather than prior understandings between the parties. Indeed, it would be an extraordinary interpretation of these integration clauses to hold that Absolute is not entitled to Citibank's good faith performance of the Master Agreements.

The Court doubts that waiving the implied covenant of good faith would even be permissible as a matter of basic principles of contract law. This is because the implied covenant of good faith and fair dealing is nothing more than "a duty to perform a contract in good faith." <u>Garrett</u>, 459

N.W.2d at 841 (citing S. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369 (1980)); see also Restatement (Second) of Contracts § 205 cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose."); id. at cmt. d ("Subterfuges and evasions violate the obligation of good faith in performance."). Citibank cannot promise to perform a contractual duty, and at the same time reserve the right to evade that duty in bad faith. That argument is nonsensical, and the Court must reject it.

Citibank grossly overstates the authorities to the contrary cited in its briefing, and the Court is neither bound nor persuaded by those authorities. In its briefing, Citibank cites to two cases in which the United States District Court for the District of South Dakota permitted contractual counterparties to waive their rights to insist on good faith performance of a contract. (See Mot. at 10-12 (citing Faloni & Assocs. v. Citibank N.A., Civ. 19-4195, 2020 WL 4698475 (D.S.D. Aug. 13, 2020); Water Works Bd. of City of Birmingham v. U.S. Bank Nat'l Ass'n, 2018 WL 3448347 (D.S.D. July 17, 2018).) The Court does not accept Citibank's characterization that these cases are "binding South Dakota authority" (Mot. at 11) and instead will apply the laws of South Dakota as defined by the Supreme Court of that state, not the federal

District Court that sits there. See Matthews v. Barr, 927 F.3d 606, 622 n.11 (2d Cir. 2019) ("[F]ederal courts are bound by the highest state court's interpretations of state law."). In any event, the Court has reviewed the two cases cited by Citibank and declines to follow them because they are unpersuasive.

The authority cited by Citibank that is most squarely on point here is Faloni & Associates v. Citibank N.A., in which the federal District Court in South Dakota held that "South Dakota law does not prevent parties from expressly disclaiming any reliance on the implied covenant of good faith and fair dealing." Civ. 19-4195, 2020 WL 4698475, at *7 (D.S.D. Aug. 13, 2020) (cited in Mot. at 10-11). Perhaps because Citibank in that case was also defending a claim by a debt purchaser for breach of the implied covenant of good faith, the contractual provision at issue was nearly identical to the one at issue here. See id. at *8. However, the sole legal authority upon which Faloni relies for permitting a waiver of the covenant of good faith is Water Works Board of City of Birmingham v. U.S. Bank National Ass'n, 17 Civ. 4113, 2018 WL 3448347, at *6 (D.S.D. July 17, 2018).

In turn, the contractual provision at issue in Water Works expressly provided that "no implied covenants or obligations shall be read into this [agreement] against the

[defendant]." Id. at *6. The Water Works opinion itself acknowledges that it is the first court to take this position on South Dakota law. Id. at *6. The Water Works court reasoned that it could not find "any restriction South Dakota law has imposed on a party's freedom of contract and its ability to contract over the implied covenant of good faith and fair dealing." Id. Accordingly, the court in Water Works sustained the parties' purported waiver of good faith compliance with the contract on public policy grounds.

This Court reads the decisions of the South Dakota Supreme Court differently. For the well-accepted policy reasons described above, it appears the South Dakota Supreme Court has never equivocated on the issue: "*Every* contract contains an implied covenant of good faith and fair dealing." Garrett, 459 N.W.2d at 841 (emphasis added); Nygaard, 731 N.W.2d at 193-194 (same); Schipporeit v. Khan, 775 N.W.2d 503, 505 (S.D. 2009) (same); Zochert v. Protective Life Ins. Co., 921 N.W.2d 479, 486 (S.D. 2018) (same); Detmers v. Costner, 994 N.W.2d 445, 457 (S.D. 2023) (same); see also Farm Credit Servs. of Am., 704 N.W.2d at 28 (referring to "an obligation of good faith that exists in *every* contractual relation" (emphasis added)). The policy discussion in Garrett, one of the cases in which South Dakota initially recognized claims under the implied covenant as a species of

46

breach of contract, strongly suggests that parties cannot disclaim their own good faith compliance with contractual duties. <u>See</u> 459 N.W.2d at 841.

Moreover, the cases cited by the federal district court in <u>Water Works</u> as "persuasive evidence of what the Supreme Court of South Dakota would do if the question were before it" underscore the factual differences between <u>Water Works</u> and the case now before this Court. 2018 WL 3448347, at *6 n.3. Particularly, <u>Water Works</u> and two of the precedents it cites involved the scope of fiduciary duties of an indenture trustee — a bank that undertook duties to service bond debt. <u>See</u> <u>id.</u> at *6; <u>Higher Educ. Loan Auth. of the St. of Mo. v. Wells Fargo Bank, N.A.</u>, No. 4:10CV01230, 2011 WL 6010683, at *4 (E.D. Mo. Dec. 2, 2011) (interpreting trust indenture); <u>First Nat'l Bank v. Am. Lenders Facilities, Inc.</u>, Civ. 00-269, 2002 WL 31163123, at *6 (D. Minn. Sept. 23, 2002) (interpreting trust indenture).[17]

As <u>Water Works</u> itself notes, the law of some states imposes implied fiduciary duties upon indenture trustees, including the duty to undertake administrative duties

_____

[17] The third supportive case cited in <u>Water Works</u> is <u>Brooks v. Arkansas-Louisiana Pipe Line Co.</u>, 77 F.2d 965 (8th Cir. 1935). <u>Brooks</u> interpreted a mineral lease under federal common law rules of contract interpretation three years before the United States Supreme Court abolished the federal general common law and instructed federal courts sitting in diversity to interpret contracts pursuant to state law. <u>See</u> <u>id.</u> at 969-970; <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938). The Court accordingly does not find the reasoning in <u>Brooks</u> persuasive or applicable to this case.

necessary to protect the rights of bond issuers and bondholders. See 2018 WL 3448347, at *7 (collecting cases and noting an indenture trustee's "duty [under New York law] to perform basic, nondiscretionary ministerial functions" that may arise). In that context, it would make sense that a trust indenture would include a provision to ensure that the "duties of an indenture trustee are generally defined by and limited to the terms of the indenture," and to guard against suits grounded upon any individual bondholder's interpretation of fiduciary duties that arise under state common law. Id. (collecting cases permitting fiduciary duties of an indenture trustee to be defined by contract.)

This Court does not understand Water Works (2018 WL 3448347, at *6), Higher Educ. Loan Authority (2011 WL 6010683, at *4), or First Nat'l Bank (2002 WL 31163123, at *6) to imply that any party in any circumstance may waive the covenant of good faith and fair dealing that is ordinarily implied in every contract. Rather, those cases are properly construed to mean only that a fiduciary can limit their duties to those expressly listed in a contract. This case, concerning a purchase-and-sale agreement between two parties, is distinct because the law does not threaten to impose fiduciary duties upon any party involved.

To summarize, the Court is not persuaded that Section 3.3.2 and Section 12.7 of the Master Agreements comprise evidence that the parties intended to waive each other's good-faith performance of their own contractual duties. Rather, the Court interprets those sections as standard integration clauses. Despite the South Dakota federal District Court's conclusions otherwise, any other result would be inappropriate because it would represent a departure from foundational principles of South Dakota state contract law, policy, and interpretation as decided by the South Dakota Supreme Court.

Having found that Absolute did not in any sense waive the covenant of good faith and fair dealing, the Court shall briefly evaluate the facial sufficiency of Absolute's three theories of its implied-covenant claim. Though two of Absolute's theories are not viable, the final theory adequately states a claim for breach of the implied covenant of good faith and fair dealing. The Court will accordingly deny Citibank's motion to dismiss the Amended Complaint's second cause of action.

Absolute first reasons that Citibank violated the covenant of good faith and fair dealing by "removing accounts from the portfolios it sold to Absolute in an arbitrary and non-random way." (Opp. at 12; see AC ¶¶ 119-121.) This first

49

theory fails because the conduct that Absolute claims violates the implied covenant of good faith is expressly governed by Section 3.5 of the Master Agreements, which prohibits Citibank from employing any criteria "in selecting the Accounts" that would be "materially adverse" to Absolute. "[W]hen the language of a contract addresses the issue," the claim is properly brought as breach of the controlling provision of the contract, not breach of the implied covenant of good faith and fair dealing. Nygaard, 731 N.W.2d at 194. The Court has already allowed Absolute's contract claim in this respect to proceed.

Absolute next argues that Citibank violated the implied covenant of good faith and fair dealing by "penalizing" Absolute for questioning the fairness of Citibank's account selection process. (Opp. at 12.) More precisely, Absolute contends that suspending the April 2020 portfolio sale was a penalty imposed in bad faith. (See AC ¶ 122.) This argument likewise cannot be sustained. It is squarely precluded by Clause 6(b) of the Release, which discharges Citibank's liability relating to claims that Citibank "breached the Addendum and/or the Agreement by suspending the sale of Accounts in April, 2020." The Court has already found that the Release is enforceable, and — unlike Clause 6(a) — Clause 6(b) is not ambiguous. Because liability under the implied

covenant of good faith is simply a species of breach of the underlying agreement (see Garrett, 459 N.W.2d at 841), and the plain English of Clause 6(b) does not permit contractual liability arising out of Citibank's suspension of the April 2020 portfolio sale, Absolute's claim fails in this respect.

Finally, Absolute alleges that it was a breach of the implied covenant of good faith and fair dealing for Citibank to fail to "provide information concerning discrepancies in the portfolios on Absolute's reasonable request." (Opp. at 12; see also AC ¶ 123.) The Court agrees. Section 3.5 of the Master Agreements forbids Citibank from "employ[ing] any selection criteria, materially adverse to the interest of [Absolute], in selecting the Accounts sold." It is a reasonable expectation that, upon suspicion that Citibank used its control process as a subterfuge to keep valuable credit card accounts for itself, Absolute could ask for more information about how the control process was administered. Absolute could further expect a detailed response from their contractual counterparty, rather than obfuscation. Moreover, Section 3.5 itself contemplates selection criteria materially adverse to Absolute to be "disclosed in the final electronic file," suggesting that the parties expected some degree of transparency with respect to account selection, yet no part of the Master Agreements goes into detail on that subject.

The Amended Complaint adequately alleges that Citibank did not in good faith afford that transparency to its partner in contract.

As a final note, the Court is not persuaded that Article 6 of the Master Agreements permitted Citibank to keep Absolute in the dark about materially adverse selection criteria once Absolute confronted Citibank about the discrepancies it noticed in the portfolio sales. (See Reply at 10.) Though Article 6 provides Absolute with many useful informational rights, that Article does not in any sense limit Absolute's right to inquire into Citibank's performance of the Master Agreements. The Master Agreements are silent on the propriety of Absolute's requests. Absolute reasonably expected to receive some explanation from Citibank when discrepancies between the sample portfolios and the actual portfolios were brought to Citibank's attention, so Citibank's motion to dismiss the second cause of action is hereby **DENIED**.

## IV.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 38) filed by defendant Citibank, N.A. ("Citibank") to dismiss the amended complaint ("Amended Complaint," Dkt. No. 27), pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) is **DENIED**; and it is further

     **ORDERED** that defendant Citibank is directed to file an answer to the Amended Complaint within twenty-one (21) days of the date of this Decision and Order.

**SO ORDERED.**

Dated:    New York, New York
          29 January 2024

                                          Victor Marrero
                                           U.S.D.J.